# UNITED STATES *v.* CHAVEZ.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF TEXAS.

No. 863.   Argued April 11, 1913.—Decided May 5, 1913.

In construing a statute a word used therein may be given the meaning it has in common speech, although it may have a narrower technical meaning.

While the word "export" technically includes the landing in, as well as the shipment to a foreign country, it is often used as meaning only the shipment from this country and it will be so construed when used in a statute the manifest purpose of which would be defeated by limiting the word to its strict technical meaning.

As used in the joint resolution of March 14, 1912, 37 Stat. 630, prohibiting exportation of munitions of war to American countries where conditions of domestic violence exist, the word "export" refers to any shipment of the prohibited articles from the United States whether there was a landing thereof in the foreign country or not.

Personal carriage of prohibited articles from this to a foreign country does not render inapplicable the prohibition to export such articles under the resolution of March 14, 1912.

THE facts, which involve the construction of the joint resolution of March 14, 1912, 37 Stat. 630, relative to shipment of arms and munitions of war to other American countries during times of domestic violence therein and what constitutes an exportation under such resolution, are stated in the opinion.

*Mr. Assistant Attorney General Adkins,* with whom *Mr. Karl W. Kirchwey* was on the brief, for the United States:

Any willful act of transporting or shipping contraband

articles from any point in the United States with Mexico.
as the destination of such transportation or shipment is
criminal. Such is the natural meaning of the words used.
As to meaning of "export" see *Swan* v. *United States*, 190
U. S. 443; 17 Op. Attys. Genl. 583. As to tax on exported
articles, see *Almy* v. *California*, 24 How. 169; *Clarke* v.
*Clarke*, 3 Woods, 408; *Fairbank* v. *United States,* 181 U. S.
283. As to tax on goods in interstate commerce, see *Coe*
v. *Errol*, 116 U. S. 517, 525; *Turpin* v. *Burgess*, 117 U. S.
504; *Dooley* v. *United States*, 183 U. S. 151; *Kidd* v. *Flag-
ler*, 54 Fed. Rep. 367; *United States* v. *Forrester*, 25 Fed.
Cas. No. 15132. As to shipment, see *Fisher* v. *Minot*, 10
Gray, 260, 262; *Harrison* v. *Fortlage*, 161 U. S. 57, 63;
*Ledon* v. *Havemeyer*, 121 N. Y. 179, 186. See also Century
Dictionary; Standard Dictionary.

The construction given resolution by court below is
inconsistent with purpose of its enactment and renders
enforcement practically impossible. This is clear from
evil sought to be remedied; means designed therefor.

The joint resolution of April 22, 1898, which formed the
basis of the present resolution, was adopted shortly after
the outbreak of the war with Spain in order to prevent the
exportation of coal or other war materials destined for the
ultimate use of the enemy. For circumstances leading to
its adoption see debate in Congress upon its introduction.
Cong. Rec., vol. 48, pt. 4, pp. 3257–3258; Cong. Rec.,
vol. 31, pt. 5, p. 4170.

The necessary consequences of the District Court's
ruling is demonstrated by the inefficacy of the resolution
as interpreted below. In the present case the accused is
bound for Mexico with the contraband articles on his per-
son. According to the District Court he has committed
no offense until he enters Mexico. But he is then beyond
the reach of process of a Federal court. At the instant
of the completion of his offense, therefore, he escapes
from the jurisdiction of the United States. Nor is his

offense extradictable. (See extradition treaty with Mexico of Feb. 22, 1899, 31 Stat. 1818.) The resolution was obviously designed to prevent individuals while in this country, and beyond the reach of Mexican authorities, from aiding the revolution in Mexico; and these are the very individuals whom the existing law, as construed below, is powerless to touch. Under this construction, a Mexican might safely cross the border into the United States, stack up with all the munitions of war he could carry, recross the boundary into Mexico, and then come back here for more—provided only that on subsequent trips the offender took care to avoid recognition and arrest for his prior offense.

Whatever mode of transportation was adopted the United States authorities certainly could not intercept the shipment, but must allow it to cross the boundary and proceed to its destination. Except for the deterrent effect of an occasional conviction the resolution would wholly fail as a measure of prevention. There is a strong presumption against that construction of a statute which virtually nullifies it and defeats its object, or which leads to the manifest absurdities heretofore suggested. *United States* v. *Hartwell,* 6 Wall. 396.

No appearance for defendants in error.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

By virtue of the act of March 2, 1907, 34 Stat. 1246, c. 2564, this direct writ of error is prosecuted for the purpose of reversing the judgment below because of an alleged erroneous construction given by the court to the joint resolution of March 14, 1912, 37 Stat. 630, in consequence of which the indictment in this case was quashed because stating no offense against the provisions of the joint resolution.

The charging part of the indictment is as follows:

"That heretofore, to-wit: on the third day of May, A. D. 1912, in the City and County of El Paso, in the State of Texas, in the Western District of Texas, and within the jurisdiction of this Court, one Arnulfo Chavez, alias Arnuto Chavez, late of said district, did unlawfully, knowingly, wilfully and with intent to export the munitions of war hereinafter described from the said City of El Paso to Ciudad Juarez in Mexico, make a certain shipment of certain munitions of war, to-wit: two thousand (2,000) Winchester cartridges of the caliber 30-30, that is to say, did make a shipment of said munitions of war from said City of El Paso and with said Ciudad Juarez in Mexico as the destination of said shipment, by transporting the same on his person from a point the exact location of which is to your Grand Jury unknown and hence not here given, near the intersection of North El Paso and San Francisco Streets in the City of El Paso to a point, the exact location of which is to your Grand Jury unknown and hence not here given, but which is near the intersection of South Stanton and Fifth Streets in the said City of El Paso."

The joint resolution is as follows:

"SECTION 1. That whenever the President shall find that in any American country conditions of domestic violence exist which are promoted by the use of arms or munitions of war procured from the United States, and shall make proclamation thereof, it shall be unlawful to export except under such limitations and exceptions as the President shall prescribe any arms or munitions of war from any place in the United States to such country until otherwise ordered by the President or by Congress.

"SEC. 2. That any shipment of material hereby declared unlawful after such a proclamation shall be punishable by fine not exceeding ten thousand dollars, or by imprisonment not exceeding two years, or both."

The proclamation of the President applying without exception or limitation the provisions of the resolution to Mexico was issued April 12, 1912. Proclamations 1912, p. 57.

Considering it to be indisputable that two acts are essential to constitute export in the legal sense, a shipment from this country to a foreign country and the landing of the goods in such foreign country, the court below held that no transgression of the prohibition of the first section, making it unlawful to export, could arise from the facts charged, because they alleged—giving them the most favorable view to the Government—but a shipment from this country to Mexico unconsummated by delivery in the foreign country. Coming to consider the second section, it was held that the act punished by that section was the exportation prohibited by the first section, and hence the charge of shipment without an averment of landing in the foreign country stated no offense punishable by the second section. The court said:

"The allegations of the indictment, as understood by the court, charge in effect that the defendant attempted to export munitions of war—nothing more; and as the joint resolution is directed against actual exportation and not merely the attempt to export, the acts charged against the defendant are not embraced within the prohibition. The word 'shipment,' employed in connection with the words 'material hereby declared unlawful' can only refer, in the judgment of the court, to material shipped, exported, to the country where the disturbance exists, since it is only such material that is declared to be unlawful by the first section of the resolution, defining the offense."

In common speech the shipment of goods from this to a foreign country without regard to their landing in such country is often spoken of as an export. It is true also that for the purposes of the provisions of § 9, Article I, of the Constitution, prohibiting the laying by Congress of

a tax or duty "on articles exported from any State" and of
§ 10, Article I, forbidding any State, without the consent
of Congress, to "lay any imposts or duties on imports or
exports," a shipment is considered as the initiation of
export so as to bring the goods shipped within the pro-
tection of the constitutional safeguards. *Almy* v. *Cali-
fornia*, 24 How. 169; *Fairbank* v. *United States*, 181 U. S.
983. Despite, however, the significance given to the
words to export in these cases, it is nevertheless certain,
as stated by the court below, that by a practically unani-
mous concensus of opinion, accurately speaking, exporta-
tion in the complete sense consists of two essential in-
gredients—the sending of merchandise from this to a
foreign country and its landing in such country. But the
question which we are called upon to solve, that is, the
meaning of the words "to export" as used in the joint
resolution, may not be disposed of by any mere abstract
consideration of the meaning of the words, but their
signification must be determined with reference to the
text of the resolution itself.

Putting out of view the parenthetical clause in the text
of the resolution concerning the proclamation of the
President, it reads as follows: "it shall be unlawful to
export any arms or munitions of war from any place in
the United States to such country," that is, the country
brought within the terms of the resolution by a proclama-
tion of the President. Conceding for argument's sake that
if the words to export stood alone in the text, that is,
were not accompanied by explanatory or defining words,
they would have to be interpreted with reference to the
meaning of export in the complete sense, that is, as includ-
ing landing in the foreign country, such concession is not
here controlling or persuasive. We say this because, as
we have seen, the words to export are expressly qualified
by a clause which serves, in a sense, to define their mean-
ing and, at all events, to make clear the nature and char-

acter of the acts intended to be embraced by the prohibition against exporting. In other words, the resolution does not say it shall be unlawful to export, but it adds, "any arms or munitions of war from any place in the United States to such foreign country." In view of the accepted significance of the words to export when used in their complete sense and of the fact that in the preceding sentences of the resolution the causes leading to its adoption are expressly stated to be the violence and confusion sometimes promoted in foreign countries "by the use of arms or munitions of war procured from the United States," the insertion of words of definition and the omission from such words of all reference to landing of the prohibited merchandise would seem to make it clear that the prohibition of the resolution was directed against the act of sending from this to the foreign and prohibited country without reference to the completion of such act by the landing or delivery of the prohibited merchandise at its destination; in other words, that the object was to forbid the act of shipment from the United States of the prohibited munitions of war to a foreign country, without reference to the fulfillment of the complete act of export by the landing of the contraband goods. If there be room for hesitancy, that is to say, ambiguity, as to the correctness of this construction of the first section, we think there can be no ground for such doubt if the context of the resolution be considered, that is, if the second section be taken into view as illustrating and making clear the text of the first section. There can be no doubt that the object of the second section was to make the prohibition of the first section operative by punishing violations of its provisions. Now, the second section does not purport to punish the act of exporting, but in express terms it only punishes "any shipment," thus affixing the construction which we have given to the first section and causing it in reason to be impossible to say that the first

section simply prohibits export in the completed sense. And this construction of the second section becomes irresistible when it is observed that for the purpose of preventing misconception the words "any shipment" are explained and their meaning made more emphatic by the declaration that they constitute the act "hereby made unlawful," thus again in express terms affixing a significance to the first section and confirming the meaning which we have given it.

And if the legislative intent manifested on the face of the joint resolution and derived from a consideration of the evil against which it was obviously intended to provide be taken into view, it is not difficult to perceive the reasons which led to the prohibition against and punishment of shipment instead of export in the complete sense. As we have previously observed, the terms of the resolution show that it was the means afforded for the promotion of turmoil and violence in certain foreign countries by the use of arms and munitions of war derived from the United States which gave rise to the passage of the resolution. But to have merely prohibited and punished the export, in the complete sense, of arms and munitions, would not have served to prevent the continued future delivery of such arms, etc., except as the anticipation of punishment might serve as a deterrent. On the other hand, as shipments from the United States were the source of the evil, a prohibition against such shipments and punishment for making them not only exerted all the deterrent influence which could possibly have arisen from punishing export, but besides would reach the acts done in the United States which were the generative source of the trouble and hence afford the means of putting an effective stop to the evil which it was the purpose to suppress. Although no question is raised on the subject, as in consequence of the construction we affix to the joint resolution we shall reverse and remand, we deem it well to say that merely because

resort was had to personal carriage as a means of moving the prohibited articles from this to a foreign country would not render inapplicable the prohibition against any shipment.

*Judgment reversed.*