**UNITED STATES v. CURTISS–WRIGHT EXPORT CORPORATION et al.**

District Court, S. D. New York.
March 24, 1936.

On Reargument April 6, 1936.

Martin Conboy and F. W. H. Adams, Sp. Assts. to Atty. Gen. (Martin Conboy, Edward J. Ennis, and David W. Wainhouse, Asst. U. S. Attys., all of New York City, of counsel), for plaintiff.

George Z. Medalie, of New York City, for defendants John S. Allard and Clarence W. Webster.

Chadbourne, Stanchfield & Levy, of New York City (Robert D. Shea, of New York City, of counsel), for defendants Curtiss-Wright Export Corporation and Curtiss Aeroplane & Motor Co., Inc.

De Forest, Cullom & Elder, of New York City (Henry W. Steingarten, of New York City, of counsel), for defendants Barr Shipping Corporation and Robert R. Barr.

J. Edward Lumbard, Jr., of New York City, for defendant Samuel J. Abelow.

BYERS, District Judge.

The defendants have been indicted in this court for conspiring to violate the "Joint Resolution To prohibit the sale of arms or munitions of war in the United States under certain conditions," 48 Stat. 811, approved May 28, 1934, and the provisions of the Proclamation issued on May 28, 1934, 48 Stat. 1744, by the President of the United States pursuant to authority provided in section 1 of the Joint Resolution.

The indictment contains a second and substantive count, not presently involved.

The defendants have demurred to the conspiracy count because they object to facing a criminal charge for which they assert that there is no constitutional basis.

The duty of the court to inquire fully into the issues thus raised seems to pertain to the very essence of our present system of government.

Such was the procedure in United States v. Chavez, 228 U.S. 525, 33 S.Ct. 595, 57 L.Ed. 950.

The Joint Resolution of May 28, 1934, 48 Stat. 811, under which the prosecution is laid, is as follows:

"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That if the President finds that the prohibition of the sale of arms and munitions of war in the United States to those countries now engaged in armed conflict in the Chaco may contribute to the reestablishment of peace between those countries, and if after consultation with the governments of other American Republics and with their cooperation, as well as that of such other governments as he may deem necessary, he makes proclamation to that effect, it shall be unlawful to sell, except under such limitations and exceptions as the President pre-scribes, any arms or munitions of war in any place in the United States to the countries now engaged in that armed conflict, or to any person, company, or association acting in the interest of either country, until otherwise ordered by the President or by Congress.

"Sec. 2. Whoever sells any arms or munitions of war in violation of section 1 shall, on conviction, be punished by a fine not exceeding $10,000 or by imprisonment not exceeding two years, or both."

The Proclamation (48 Stat. 1744) bears the same date, and reads:

"Whereas section 1 of a joint resolution of Congress, entitled 'Joint Resolution To prohibit the sale of arms or munitions of war in the United States under certain conditions,' approved May 28, 1934, provides as follows: * * *

"Now, Therefore, I, Franklin D. Roosevelt, President of the United States of America, acting under and by virtue of the authority conferred in me by the said joint resolution of Congress, do hereby declare and proclaim that I have found that the prohibition of the sale of arms and munitions of war in the United States to those countries now engaged in armed conflict in the Chaco may contribute to the reestablishment of peace between those countries, and that I have consulted with the governments of other American Republics and have been assured of the cooperation of such governments as I have deemed necessary as contemplated by the said joint resolution; and I do hereby admonish all citizens of the United States and every person to abstain from every violation of the provisions of the joint resolution above set forth, hereby made applicable to Bolivia and Paraguay, and I do hereby warn them that all violations of such provisions will be rigorously prosecuted.

"And I do hereby enjoin upon all officers of the United States charged with the execution of the laws thereof, the utmost diligence in preventing violations of the said joint resolution and this my proclamation issued thereunder, and in bringing to trial and punishment any offenders against the same.

"And I do hereby delegate to the Secretary of State the power of prescribing exceptions and limitations to the application of the said joint resolution of May 28, 1934, as made effective by this my proclamation issued thereunder.

"In Witness Whereof, I have hereunto set my hand and caused the seal of the United States to be affixed.

"Done at the city of Washington this twenty-eighth day of May, in the year of our Lord nineteen hundred and thirty-four, and of the Independence of the United States of America the one hundred and fifty-eighth.

"Franklin D. Roosevelt.
"By the President:
"Cordell Hull
"Secretary of State."

The Proclamation of revocation is dated November 14, 1935, and so far as presently material is as follows:

"Whereas by a Proclamation of the President issued on May 28, 1934, pursuant to a Joint Resolution of Congress approved by the President on the same date, it was declared that the prohibition of the sale of arms and munitions of war in the United States to those countries then engaged in armed conflict in the Chaco might contribute to the reestablishment of peace between those countries; and

"Whereas by virtue of the Joint Resolution and the Proclamation above mentioned it became unlawful to sell arms or munitions of war to Bolivia or Paraguay; and

"Whereas the Peace Conference in Plenary Session in Buenos Aires formally adopted on October 28, 1935, a Resolution declaring that the war between Bolivia and Paraguay had come to an end; * * *

"Now, Therefore, I, Franklin D. Roosevelt, President of the United States of America, do hereby declare and proclaim that I have found that the prohibition of the sale of arms and munitions of war in the United States to Bolivia or Paraguay will no longer be necessary as a contribution to the reestablishment of peace between those countries, and the above-mentioned Proclamation of May 28, 1934, is hereby revoked as to the sale of arms and munitions of war to Bolivia or Paraguay from and after November 29, 1935, provided, however, that this action shall not have the effect of releasing or extinguishing any penalty, forfeiture or liability incurred under the aforesaid Proclamation of May 28, 1934, or the Joint Resolution of Congress approved by the President on the same date; and that the said Proclamation and Joint Resolution shall be treated as remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture or liability.

"In Witness Whereof, I have hereunto set my hand and caused the Seal of the United States of America to be affixed.

"Done at the City of Washington this 14th day of November, in the year of our Lord nineteen hundred and thirty-five, and of the Independence of the United States of America the one hundred and sixtieth.

"Franklin D. Roosevelt.
"[Seal]
"By the President:
"Cordell Hull
"Secretary of State."

The indictment as here involved charges the commission of three overt acts in pursuance of the alleged conspiracy, by three individual defendants and one corporate defendant, during July, 1934; that is, during the period in which the Joint Resolution was said to be in force in virtue of the first Presidential Proclamation and before its stated revocation, by the second.

The objections urged in behalf of the demurrer are:

First. That the Joint Resolution did not accomplish a valid delegation of legislative power to the Executive.

Second. That the Executive did not meet the requirements laid upon him by the terms of the Joint Resolution, in issuing his first Proclamation, and in consequence the latter was legally insufficient to render the former operative.

Third. That, in any case, prosecution for the alleged offenses could not be instituted after the effective date of the second Proclamation, November 29, 1935, and hence this indictment which was found January 27, 1936, does not lie.

■ The first objection draws into question the concept which is embodied in the following words of the Joint Resolution (48 Stat. 811):

"Resolved * * * That if the President finds that the prohibition of the sale of arms and munitions of war in the United States to those countries now engaged * * * may contribute to the reestablishment of peace between those countries, and if after consultation with the governments of other American Republics * * * he makes proclamation to that effect, it shall be unlawful to sell * * * until otherwise ordered by the President or by Congress," etc.

The argument runs, that Congress declares that the commission of a crime will result from the violation of a Joint Resolution, if that resolution is put into operation by the Executive, as the result of the exercise by him of an assumed capacity to forecast the probable result of so imparting vitality to the legislation.

It is said that this constitutes an attempt to substitute Executive determination, as to the probable future efficacy of a given law, for legislative judgment on the subject, and that the Constitution confides no such function to other than the law-making department of our government.

The expression quoted employs the words "if the President finds" which would be appropriate to an existing, or to a past state of facts; in their legal sense, they cannot refer to future contingencies, i. e., that which "may contribute to" a desired result, if precision in the formulation of a criminal law is fairly to be required.

If accurate language had been employed, the resolution would have read something like this: "if the President shall be of the opinion that the reestablishment of peace is likely to result from the prohibition of the sale," etc., and for present purposes the resolution must be construed as though it had been enacted in that form, for that is what it means.

The implication of such a formula would have been, that if the Executive should be of the opinion that the desired result was *not* likely to be accomplished by putting the Joint Resolution into effect, it would suffer still birth.

Examination of the question will proceed as though the legislative purpose had found expression in words appropriate to embody that which alone is implicit in the resolution.

The government asserts that there has been no "improper delegation of legislative authority to the Executive" because the resolution declares the policy of Congress and fixes the limits of the Executive policy. Reliance is had upon the following:

Hampton & Co. v. United States, 276 U. S. 394, 48 S.Ct. 348, 72 L.Ed. 624:

Here there was a review of a judgment of the United States Customs Court sustaining a rate of duty on imports, increased by presidential proclamation pursuant to authority conferred by section 315, title III of the Tariff Act of 1922 (19 U.S.C.A. §§ 154–159). The statute authorized an increase in duties if the President after investigation "shall find it thereby shown [by the investigation] that the duties fixed in this Act [chapter] do not equalize the said differences in costs of production in the United States and the principal competing country he shall, by such investigation, ascertain said differences and determine and proclaim the changes in classifications or increases or decreases in any rate of duty provided in this Act [chapter] shown by said ascertained differences in such costs of production necessary to equalize the same.". Section 315 (a), 19 U.S.C.A. § 154.

In other words, the Executive was empowered to cause a mathematical calculation to be made, upon current data, as the basis for a true "finding," and to act in obedience to the result.

The opinion of the Supreme Court, upholding the delegation by Congress of its tariff making powers in such a restricted way, and according to so clear a formula, serves to bring into contrast that which was there found to be valid, and that which has here been attempted.

Avent v. United States, 266 U.S. 127, 45 S.Ct. 34, 35, 69 L.Ed. 202:

This case, in upholding the denial of a motion in arrest of judgment in a criminal case, decides that Congress could delegate to the Interstate Commerce Commission the power to suspend its rules, and to issue orders giving priority and preference in the conduct of interstate commerce, and could make a violation of its rules a crime. The basis for such orders was the Transportation Act of 1920, § 402 (15), 49 U.S.C.A. § 1 (15), which "authorizes the Interstate Commerce Commission, whenever it is of opinion that shortage of equipment, congestion of traffic or other emergency requiring immediate action exists in any section of the country, to suspend its rules as to car service and to make such reasonable rules with regard to it," etc.

This clearly delegated to the Commission the power to act with reference to an existing state of affairs which in its opinion required action to meet a present emergency. There was no effort to clothe the Commission with the power to act or to refrain from acting according to its opinion as to whether given legislative purpose "may contribute" to a future result.

United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 484, 55 L.Ed. 563:

Here a demurrer to an indictment was overruled, in a case involving the use by the defendant of a portion of the national forest reserve, for the grazing of sheep, without procuring a permit from the Secretary of Agriculture; the issuance of such a permit was held to have been within the contemplation of Congress, because the act creating the reserve (30 Stat. 35) provided for the ingress and egress of resident settlers complying with the rules and regulations covering such reservation; it declared that the Secretary should make such rules, and that any violation of the law itself "or such rules and regulations shall be punished."

The court declared that the delegation of administrative powers was necessary and valid; that the broad purposes of the law were established by Congress, and that the issuance of such a permit as the defendant had failed to procure was within the administrative competency of the Secretary.

In reaching this conclusion, the court quoted with approval the following language from the opinion in Marshall Field & Co. v. Clark, 143 U.S. 649, at page 694, 12 S.Ct. 495, 36 L.Ed. 294:

"The Legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government."

The Aurora v. United States, 7 Cranch, 382, 3 L.Ed. 378:

For a discussion of the issues involved in this case, and an understanding of the nature of the functions delegated by Congress to the Executive, reference should be had to the opinion in Panama Refining Co. v. Ryan, 293 U.S. 388, at page 423, 55 S. Ct. 241, 79 L.Ed. 446.

Presently it may be said that the President was empowered to declare that France or Great Britain had revoked or modified edicts which were inimical to the United States, and if that fact were embodied in a Proclamation, the trade suspended by the Act of Congress and by the act laying an embargo, might be "renewed with the nation so doing."

The President was not authorized to hazard an opinion as to the probable effect, in the future, of certain legislation; he was empowered to establish a state of existing fact concerning governmental action which had been taken by a foreign power.

United States v. Chavez, 228 U.S. 525, 33 S.Ct. 595, 596, 57 L.Ed. 950:

Here a decision sustaining a demurrer was reversed in a criminal cause in which the defendant was charged with violating a joint resolution which made it a crime to export munitions of war; the indictment averred that the defendant made such "a shipment of said munitions of war from said city of El Paso and with said Ciudad Juarez in Mexico as the destination" from one part of El Paso to another. Apparently the court below had sustained the demurrer on the theory that export had not been completely alleged, because there was no averment that delivery in Mexico had been consummated. This view was rejected by the Supreme Court.

The rule of decision in that case does not touch the point of attack upon this demurrer, but the Joint Resolution No. 10 of March 14, 1912, 37 Stat. 630 (22 U.S.C.A. § 236 and note), which was rendered operative by Presidential Proclamation, is of great importance, thus:

Section 1: "That whenever the President shall find that in any American country conditions of domestic violence exist which are promoted by the use of arms or munitions of war procured from the United States, and shall make proclamation thereof, it shall be unlawful to export, except under such limitations and exceptions as the President shall prescribe, any arms or munitions of war from any place in the United States to such country until otherwise ordered by the President or by Congress.

"Sec. 2. That any shipment of material hereby declared unlawful after such a proclamation shall be punishable by fine not exceeding ten thousand dollars, or by imprisonment not exceeding two years, or both."

The proclamation implementing the foregoing bore date of April 12, 1912.

It will be seen that the President was authorized to bring into operation a law, a violation of which would constitute a crime, as the result of finding an existing condition of facts, namely, domestic violence in another country, promoted by the use of arms procured from this country.

The distinction between such a state of then existing fact, and what it was hoped, on May 28, 1934, "may contribute" to a future consummation, seems to be obvious.

The point of departure from the foregoing examples of a sanctioned delegation of power to declare a legislative purpose effective in the event that certain prescribed conditions are found to exist, which stands forth clearly in the subject-matter of this examination, is thought to be of an entirely practical and substantial nature.

If Congress had conducted a hearing in order to inform itself as to the probable effect of the proposed legislation, those who now stand at this bar, charged with the commission of crime because they did sell the interdicted implements in the ordinary course of business, might have been able to demonstrate to Congress that the re-establishment of peace, between the belligerents in the Chaco dispute, would not be promoted by cutting off a supply of munitions of war from this country; that foreign sources of supply would still be available to the combatants, and that the purpose of the resolution would not come to fruition as the result of the contemplated embargo.

Had such process been employed, these defendants would have had an opportunity to submit their data for the information of Congress, and in aid of the essentially legislative function of determining the probable effect of the contemplated measure. Instead, the Executive was empowered to make up the legislative mind as to the future efficacy of the law, as the reason for giving vitality to it (and apparently this was done without according a hearing to any one likely to be affected).

It is thought that the Joint Resolution embodied such an attempted abdication of legislative responsibility, as to deprive it of constitutional validity. Stated in lowest terms, it is conceived to be the duty of Congress alone to conclude whether a given law will work.

The defendants rely largely upon the decisions of the Supreme Court in the Panama case, supra, and in A. L. A. Schechter Poultry Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A. L. R. 947, which involved broader delegations of legislative duty to the Executive department of the government, than are here presented. It is not thought that those decisions necessarily control the matter here examined, but that the distinction pointed out in the opinion in the latter case (Schechter Poultry Corporation v. United States, 295 U.S. 495, at page 538, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947) between a true finding of fact, and the formulation of an opinion concerning future probabilities, is such a recognition of the issue here presented, that this court is precluded from reaching any conclusion but that the first ground of demurrer is fatal to the indictment.

Upon the assumption that this conclusion is mistaken, there remain to consider the other objections to the indictment.

■ As to the argument that there was a failure by the President to consult with the governments of other American Republics, "and with their cooperation, as well as that of such other governments as he may deem necessary" take action as permitted (because the Proclamation bears the same date as the Joint Resolution, which means that the consultations could not have been had and the cooperation could not have been secured in so short a space of time) there is this to be said:

The Proclamation recites the "finding" that the prohibition in question "may contribute to the reestablishment of peace" between the combatant countries, "and that I have consulted with the governments of other American Republics and have been assured of the cooperation of such governments as I have deemed necessary as contemplated by the said joint resolution."

It is thought that this recital of what has been done precludes inquiry on the subject by the court. The joint resolution does not require that the Proclamation shall recite the processes conducted by the Executive, which might lead to its issuance. The mere statement that the prescribed things have been done by the President which the Joint Resolution said were requisite to the issuance of the Proclamation, is conclusive for present purposes.

■ The defendants argue that there is a difference between the legislative specification and the Executive performance, namely, that the former was of actual co-operation by the governments of other American Republics, while what was obtained, according to the Proclamation, was the *assurance* of co-operation; and that this difference constitutes a fatal legal infirmity in the vitalizing Executive process.

The ready answer is that the President was not instructed as to the exact measure or manifestation of co-operation which he was expected to secure from other nations. An assurance of co-operation implies a meeting of the minds, and thus of itself constitutes the essential element of the specified requirement. It does not lie with this court to apply a more precise test. Congress was satisfied that the Proclamation was adequately supported, for the Joint Resolution was not altered, nor was its duration abbreviated by legislative action; therefore it would seem that this court may not with propriety inquire further into the subject. This ground of demurrer is thought to be without support.

The third objection goes to the reservation contained in the second Proclamation to the effect that the revocation of the original Joint Resolution "shall not have the effect of releasing or extinguishing any penalty, forfeiture or liability incurred" during the effective period thereof.

The argument is, that this was the attempted exercise by the Executive of a purely legislative function, and that the President was not competent, in the legal sense, to keep alive the asserted criminal liability of these defendants.

Reliance is had upon the general principle stated for instance in Yeaton v. United States, 5 Cranch, 281, 283, 3 L.Ed. 101 (a forfeiture case for violation of the Non-Intercourse Act of 1806) "that after the expiration or repeal of a law, no penalty can be enforced, nor punishment inflicted, for violations of the law committed while it was in force, unless some special provision be made for that purpose by statute." It is urged that only by legislative action could the right of prosecution be retained for alleged violation of this Joint Resolution while it was extant, and that the power to do this was not confided to the President, and if that was attempted, the delegation was without warrant in the Constitution.

It is said that section 13, Revised Statutes (1 U.S.C. § 29 [1 U.S.C.A. § 29]) has no application. That provision is:

"Repeal of statutes as affecting existing liabilities. The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability."

It is said that the word "repeal" was used in a precise sense, and was intended to mean the abrogation of one statute by another, and was not intended to accomplish the survival of liability to prosecution initiated after the expiration or termination of this Joint Resolution.

It will be observed that this argument attributes to Congress the initial purpose of forbidding the export to certain countries of munitions of war, during a period to be limited by the President or Congress; and the further purpose that immunity from prosecution for a violation of the embargo should arise upon the expiration thereof. Is this incongruity of intention plainly to be perceived?

To answer that question, requires an understanding of the law in response to which the quoted statute was enacted. It was stated in Yeaton v. United States, supra, by Chief Justice Marshall, in a forfeiture cause in Admiralty based upon an alleged violation of the Non-Intercourse Act of 1806 (an appeal having been presented after the expiration of the statute, and being deemed to constitute a hearing de novo):

" * * * a sentence of condemnation cannot be pronounced on account of a forfeiture which accrued under a law not in force at the time of pronouncing such sentence, unless, by some statutory provision, the right to enforce such forfeiture be preserved."

The foregoing is quoted from the "sentence" of the court, and follows a statement of its opinion reading: " * * * it has been long settled, on general principles, that after the expiration or repeal of a law, no penalty can be enforced, nor punishment inflicted, for violations of the law committed while it was in force, unless some special provision be made for that purpose by statute."

See, also, The Irresistible, 7 Wheat. 551, 5 L.Ed. 520, in which it is said by the same authority: "Now, it is well settled, that an offense against a temporary act cannot be punished after the expiration of the act, unless a particular provision be made by law for the purpose."

United States v. Tynen (1871) 11 Wall. 88, 20 L.Ed. 153, decided that a criminal prosecution laid under a statute of 1813 (2

Stat. 809) having to do with offenses against the naturalization laws must be dismissed, because after the indictment had been demurred to in the Circuit Court, Congress passed a new statute which was approved in July, 1870 (16 Stat. 254), covering the same subject, and which was repugnant to the earlier statute and thereby accomplished its repeal, although in terms there was no such provision.

The repeal having been accomplished, prosecution under the old law could not be had.

Revised Statutes, § 13, was passed on February 25, 1871, eight days after the submission of the Tynen case to the court, and may be thought to have reflected a legislative purpose to avoid a repetition of the legal situation therein disclosed.

The statute dealt with the subject of "repeal," although the earlier cases above quoted referred to the expiration of temporary laws, as well as to the repeal of those of more permanent character.

Whether there is a distinction to be made concerning the necessity for preserving penalties, depending upon whether expiration or repeal is involved, may be laid aside for the moment. It is clear that the continuance of responsibility to answer a criminal charge under such circumstances is a matter of legislative concern. It pertains to the law-making power.

If survival of liability is asserted, it must proceed either from the silence of the repealing statute concerning immunity (by reason of section 13, Revised Statutes) or from a direct and appropriate expression of the legislative purpose. It is not a subject for Executive pronouncement.

The most recent example of similar legislation with which the court is familiar is Public Joint Resolution 67 of the 74th Congress, 49 Stat. 1081 (see 22 U.S.C.A. § 245a et seq.), approved August 31, 1935. It prohibits, among other things, the export of arms, etc., to belligerent countries. As amended February 29, 1936 (Public Resolution No. 74, 22 U.S.C.A. § 245a), it provides, "Whenever the President shall find that there exists a state of war between or among two or more foreign states" the prohibition shall become effective through Presidential proclamation; he is given the power to revoke when the described conditions have ceased to exist, in his judgment (49 Stat. 1081), and it continues:

"Except with respect to prosecutions [sic] committed or forfeitures incurred prior to March 1, 1936, this section and all proclamations issued thereunder shall not be effective after February 29, 1936."

The foregoing was amended on the last-mentioned date to read:

"Except with respect to offenses committed, or forfeitures incurred prior to May 1, 1937, this section and all proclamations issued thereunder shall not be effective after May 1, 1937." 22 U.S.C.A. § 245a.

This is such an expression of legislative purpose, respecting the survival of liability beyond the duration of the resolution, as to remove the subject from the field of inquiry. It is compatible only with a recognition that the will of the legislative and not that of the Executive department of the government was involved in the law-making process.

The presence of such a provision in the Joint Resolution under examination, of course, would have avoided the issue now raised.

If the reasoning thus far is sound, it results that the proviso preserving beyond November 29, 1935, responsibility to answer for alleged violations committed while the law was in operation, was without effect, because it is part of a Presidential Proclamation and not of the Joint Resolution. It neither added to, nor subtracted from, the legal status of those charged with offending against the embargo. There seems to be nothing in the Joint Resolution delegating to the President the power or authority to assert the reservation stated in the proviso.

There remains to consider whether the omission by Congress to fortify the May 28, 1934, Joint Resolution, in respect of prosecution for offenses committed before its expiration, leads to the result asserted by the defendants.

When the resolution was under advisement, Congress contemplated that it would come to a termination at some future time, not as the result of the passage of an act of repeal, but in obedience to the self-contained formula of duration.

Congress was also aware of section 13 of the Revised Statutes (1 U.S.C.A. § 29).

Commenting upon that law, the Supreme Court has said, in Great Northern R. Co. v. United States, 208 U.S. 452, at

page 465, 28 S.Ct. 313, 316, 52 L.Ed. 567: "* * * the provisions of § 13 are to be treated as if incorporated in and as a part of subsequent enactments, and therefore under the general principles of construction requiring, if possible, that effect be given to all the parts of a law, the section must be enforced unless, either by express declaration or necessary implication, arising from the terms of the law as a whole [Hepburn Act, 34 Stat. 584], it results that the legislative mind will be set at naught by giving effect to the provisions of § 13."

In formulating the Joint Resolution, Congress must be deemed to have considered that the necessity for preserving to the government the right to prosecute here asserted, had been anticipated by section 13 of the Revised Statutes. A contrary view would not accord with the foregoing interpretation of the statute.

To recur to the argument of the defendants, that a repeal by statutory enactment differs from the expiration of a law intended to continue temporarily, it must be observed that no good reason is presented to support such a fancied distinction.

It is not thought that Congress entertained one purpose concerning offenses committed during the life of a statute having indefinite duration, and subject to termination by statutory repeal, and an opposite purpose, or no purpose, with respect to a law having a temporary existence which would come to an end as stated in its own terms. In both cases, it is the survival of responsibility for a violation, that is of the essence, and not the nature of the occasion upon which that survival rests.

It is therefore concluded that the absence of such a proviso, in the Joint Resolution under discussion, does not constrain the court to accept the defendants' views on this branch of the case.

It must be conceded that this conclusion may be thought to be impaired by the terms of Joint Resolution 67 of the 74th Congress, above-quoted. It may well be argued that Congress has therein written its own understanding of the necessity for the inclusion of such a reservation, and the force of the argument is not to be denied. It is presently preferred, however, to interpret the presence of that expression as manifesting choice rather than necessity; as something added from an abundance of caution and to preclude any question such as is here presented, rather than as a recognition that its absence would be fatal to a prosecution for an offense dating within, but laid beyond, the effective period.

The defendants rely principally on United States v. Chambers, 291 U.S. 217, 54 S.Ct. 434, 78 L.Ed. 763, 89 A.L.R. 1510, in which it was decided that the Volstead Law (27 U.S.C.A.) did not survive the adoption of the Twenty-first Amendment. The reason for that decision was that the organic law of the nation was altered by the adoption of that Amendment, so as to evacuate Congress of the power to enact legislation on the subject of national prohibition; the result being that there was no legislative capacity to be illuminated by section 13 of Revised Statutes, and thus render valid prosecutions for Volstead law violations, subsequent to the adoption of the said Amendment.

That reasoning fails entirely in respect of this Joint Resolution. The capacity of Congress to legislate on the subject of an embargo has not been impaired by any agency whatever, and the fact that the Joint Resolution was brought to a close by the exercise of the power to "otherwise order" does not affect, in any respect, the legislative purpose which has been discussed.

The demurrer will be sustained upon the first ground and overruled upon the second and third. Settle order.

## On Reargument.

Reargument of this demurrer was had, as to the first ground, on March 31, 1936, at the instance of the government.

The respects in which the opinion heretofore rendered is said to disclose a failure by the court to understand the issues may be briefly stated, thus:

(a) The delegation by Congress to the President was of the power to find a fact; it is not to be distinguished from the like authority embodied in the Joint Resolution (March 14, 1912, 37 Stat. 630 [22 U.S.C.A. § 236 and note]) which was before the court in United States v. Chavez, 228 U. S. 525, 33 S.Ct. 595, 57 L.Ed. 950.

(b) This Joint Resolution is essentially similar to that of January 31, 1922, under which six presidential proclamations were issued. That resolution (22 U.S.C. §§ 236 and 237 [22 U.S.C.A. §§ 236, 237]) is as follows:

"§ 236. *Exportations of munitions of war restricted.* Whenever the President finds that in any American country, or in

any country in which the United States exercises extraterritorial jurisdiction, conditions of domestic violence exist, which are or may be promoted by the use of arms or munitions of war procured from the United States, and makes proclamation thereof, it shall be unlawful to export, except under such limitations and exceptions as the President prescribes, any arms or munitions of war from any place in the United States to such country until otherwise ordered by the President or by Congress. (Jan. 31, 1922, c. 44, § 1, 42 Stat. 361.)

"§ 237. *Penalty for exportation of munitions of war.* Whoever exports any arms or munitions of war in violation of the preceding section shall, on conviction, be punished by fine not exceeding $10,000, or by imprisonment not exceeding two years, or both. (Jan. 31, 1922, c. 44, § 2, 42 Stat. 361.)"

(c) The successful conduct of the foreign relations of this government, requires that this demurrer be overruled.

As to the first of these, while the argument now presented is somewhat more analytical in form than upon the original hearing, the contentions are the same. They have been re-examined in deference to the importance of the subject, and to the earnest and forceful presentation in which they are submitted.

It is said that the intention of Congress is clear, that the United States should give aid to the reestablishment of peace between the belligerents to the Chaco dispute. So much cannot be debated.

Then, that the legislation prescribes a definite standard by which this intent is to be accomplished, "viz., the effect upon the reestablishment of peace of the prohibition of the sale of arms and munitions of war in the United States."

It will be assumed arguendo that the foregoing is a standard.

Finally, that "the fact left to the President to find was that the prohibition of the sale of arms in the United States had ability to contribute to the reestablishment of peace * * *."

These quotations from the brief will insure the statement of the government's position in precise form.

They probably mean that it was to be anticipated that the Presidential opinion would be formed as the result, in part at least, of an understanding of pertinent facts; it will be seen that the resolution makes no requirement concerning the basis of the conclusion which the President was authorized to reach, before rendering the law operative.

The contentions of the government disclose that, on May 28, 1934, the object to be accomplished lay in the future; that the standard—if such it was—that was to govern the process of coming to a conclusion, could yield at best an opinion that, if certain transactions were forbidden, the interdiction would have ability (capacity) to contribute to the desired future result.

The argument does not avoid what is plainly seen, namely, that the translation of Congressional intent, into operative legislation, required not only information (which requirement may be inferred) but the holding of an opinion as to the capacity of the legislation to accomplish its avowed object; that requirement is stated in unmistakable terms.

In all cases which have been examined, the purposes or opinions of Congress have been embodied in the enabling legislation, along with a formula for carrying them into effect, either (a) as to administrative details, or (b) if or when a given state of facts is shown to exist.

Examples of these two classes of cases appear in the opinion heretofore rendered.

The Chavez Case, supra, was discussed, and if the difference between a true finding of the existence of warfare "promoted by the use of arms," etc., procured from the United States, and that which is here called a finding (but which by its nature is an opinion or forecast), has not been demonstrated, further exposition of the subject would be of no avail.

The second consideration advanced has to do with the resolution quoted, of January 31, 1922. That was an amended form of the resolution involved in the Chavez Case, and was considered in connection with the first hearing. The amendments extended the scope of the legislation so as to embrace countries not originally comprehended, and added the words "or may be" after the word "are" referring to conditions of violence "which are or may be promoted by the use of arms," etc.

Apparently it is not argued that the second of these two changes was intended to import an element of futurity, or of prospective scope to the subject-matter of the resolution. It is thought that the change

indicated a purpose to authorize the issuance of a proclamation in any case in which the conditions of domestic violence are perhaps promoted, etc., that is, upon a state of facts that might fall somewhat short of certainty.

In all material aspects, the 1922 resolution does not differ from that upon which the Chavez Case was decided.

The third contention, concerning the conduct of foreign affairs, seeks to introduce an element which is not necessarily involved in this case. However labor-saving the device may be, of writing a criminal law into a Joint Resolution which deals primarily with matters of international relations, it is thought that the two subjects may not lend themselves conveniently to statutory amalgamation.

If an amendment to the Criminal Code had been adopted by Congress, to prohibit the making of contracts to sell arms and munitions in the United States, and it had contained a clause reading: "If the President shall find that this law will result in bringing about what Congress declares to be its purpose and shall so declare, then this law shall take effect on the date of his proclamation," probably the delegation of the power to perform an essentially legislative function would be so clear that there would be little room for dispute as to its presence.

It is not thought that a different situation is presented because the instant penal provision appears as part of a Joint Resolution the major aspect of which may pertain to international affairs. If penalties of a criminal nature must be imbedded in such legislation in the interest of efficacy, care should be exercised to preserve constitutional amenities during the process of formulation.

The court has not been unmindful of the presumption of validity or constitutionality which attaches to all national legislation; it has not intended to do violence to the traditional practice of Congress in reposing the widest discretion in the Executive Department of the government in the conduct of the delicate and nicely poised issues of international relations; it has merely been required to decide the issues raised by this demurrer, as a matter of everyday duty.

Settle order in accordance with the original opinion.