UNITED STATES *v.* THE NATIONAL SUGAR REFINING CO. (No. 4683) [1]

United States Court of Customs and Patent Appeals, November 7, 1951

*David N. Edelstein,* Assistant Attorney General (*Alfred A. Taylor, Jr., Richard E. FitzGibbon,* and *Joseph F. Donohue,* special attorneys, of counsel), for the United States.

*Benjamin M. Altschuler* for appellee.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Associate Judges

JOHNSON, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, First Division, rendered pursuant to its decision, C. D. 1307,

[1] C. A. D. 470.

directing the Collector of Customs to reliquidate certain entries and to allow drawback thereon.

The facts of the case were stipulated and are as follows: The appellee, National Sugar Refining Co., sold to various buyers for export 2,241,200 pounds of refined sugar covered by 13 drawback entries herein involved. All title to the sugar had passed to the buyers prior to exportation, but the right to drawback of customs duty remained with appellee. The necessary customs and shipping documents were properly and timely filed providing that appellee should be the recipient of the drawback when allowed. The sugar was laden in New York under Customs Supervision for export to St. John's, Newfoundland and the vessel sailed from New York the night of October 18, 1947. In the early morning of October 19, 1947, when the vessel was about twenty miles out at sea, it was in a collision which caused such damage that it returned to New York at about 4:00 p. m. on that day. Of the 2,241,200 pounds of sugar originally laden, 990,236 pounds remained intact and was subsequently exported on the same vessel to St. John's, Newfoundland. Drawback was paid to appellee on this sugar by order of the Bureau of Customs. 1,038,736 pounds were presumably lost at sea as a result of the collision. Drawback was paid to appellee on this sugar by order of the Bureau of Customs. After the vessel returned to New York, 212,208 pounds were relanded in damaged condition. No customs entry was made at the time of relanding. The damaged sugar was sold by a surveyor for the benefit of the insurers. Appellee did not own the damaged sugar when it was returned and relanded, nor did appellee have anything to do with its sale after it was relanded. The return, relanding and sale of the damaged sugar was neither for the account or interest of appellee. Drawback on this relanded sugar was denied appellee by order of the Bureau of Customs on the ground that the same had not been exported as required by section 313 (a) of the tariff act. Appellee protested this action claiming that the damaged and relanded sugar should have been treated as an exportation and a reimportation under paragraph 1615 of the Tariff Act of 1930, as amended, rather than as a nonexportation and nonimportation.

The pertinent portions of section 313 (a) and paragraph 1615, as amended by the Customs Administrative Act of 1938, are reproduced below:

SEC. 313. DRAWBACK AND REFUNDS.

(a) *Articles Made from Imported Merchandise.*—Upon the exportation of articles manufactured or produced in the United States with the use of imported merchandise, the full amount of the duties paid upon the merchandise so used shall be refunded as drawback, less 1 per centum of such duties, except that such duties shall not be so refunded upon the exportation of flour or by-products produced from wheat imported after ninety days after the date of the enactment of this Act. Where two or more products result from the manipulation of imported

merchandise, the drawback shall be distributed to the several products' in accordance with their relative values at the time of separation.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Par. 1615. [Free List] (a) Articles, the growth, produce, or manufacture of the United States, when returned after having been exported, without having been advanced in value or improved in condition by any process of manufacture or other means.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(e) The foregoing provisions of this paragraph shall not apply to—
(1) Any article upon which an allowance of drawback has been made under section 313 of this Act or a corresponding provision of a prior tariff Act, unless such article is in use at the time of importation as the usual container or covering of merchandise not subject to an ad-valorem rate of duty;

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(f) Upon the entry for consumption or withdrawal from warehouse for consumption of any article previously exported, which is excepted from free entry under this paragraph by the foregoing subparagraph (e) and is not otherwise exempted from the payment of duty, there shall be levied, collected, and paid thereon, in lieu of any other duty or tax, a duty equal to the total duty and internal-revenue tax, if any, then imposed with respect to the importation of like articles not previously exported from the United States, but in no case in excess of the sum of customs drawback, if any, proved to have been allowed upon the exportation of such article from the United States plus the amount of the internal-revenue tax, if any, imposed at the time such article is entered for consumption or withdrawn from warehouse for consumption upon the importation of like articles not previously exported from the United States. Manufactured tobacco subject to duty hereunder shall be retained in customs custody until internal-revenue stamps in payment of any part of the legal duties measured by a rate or amount of internal-revenue tax shall have been placed thereon.

It is the government's contention that the word "exportation" as used in the drawback provisions of the tariff act means something more than a mere shipping of merchandise outside the territorial limits of the United States and contemplates that such merchandise shall be landed in a foreign country or at least that it shall remain outside the United States and not be returned to this country.

Appellee argues and the Customs Court decided that goods may be said to be exported, at least so far as the drawback statute is concerned, when they have been physically carried out of this country with the intention of uniting them with the goods of a foreign country.

In the leading case of *Swan & Finch Co.* v. *United States*, 190 U. S. 143, the merchandise involved was placed on board a vessel bound for a foreign port to be used and consumed on board the vessel during its voyage, and it in fact was so used and consumed. The court there held that "exportation," in the sense of the drawback statute, did not simply mean a carrying out of the country but also contemplated an *intention* of not returning. The question of an actual landing in a foreign country or of non-return to the United States was not before the court and it did not pass thereon. The same is true in

each of the following cases cited by appellant on that point, *Flagler* v. *Kidd et al.*, 78 Fed. 341; *Kennedy et al.* v. *United States*, 95 Fed. 127.

In the case of *United States* v. *Chavez*, 228 U. S. 525, cited by appellant for a definition of the word "exportation," the Supreme Court of the United States construed the word as used in a joint resolution of Congress making it illegal to export arms from the United States to an American country in which conditions of domestic violence existed, in that case, Mexico. While noting that "by a practically unanimous concensus of opinion, accurately speaking, exportation in the complete sense consists of two essential ingredients—the sending of merchandise from this to a foreign country and its landing in such country," the court held that with reference to the text of the resolution before it "export" comprehended the sending without reference to the landing.

The question before this court, i. e., the meaning of the word "exportation" as used in section 313 (a) of the tariff act, may not be disposed of by any mere abstract consideration of the word, but its significance must be determined with reference to the text of the act in which it appears and with reference to the purpose of the pertinent section of that act.

There have been drawback provisions in the administration of customs duties ever since the Act of March 3, 1791 (1 Stat. 210). The purpose of such drawback provisions has uniformly been to encourage manufactures for exportation by making duty free imports which are manufactured here and then returned whence they came or to some other foreign country. *Tidewater Oil Co.* v. *United States*, 171 U. S. 210; *Campbell* v. *United States*, 107 U. S. 407. Obviously the purpose of the drawback provisions of the tariff act would be frustrated if imported materials could be manufactured and then placed upon the domestic market duty free through the mere expedient of shipping the merchandise a nominal distance beyond our borders and then returning it as a nonimportation. It is the government's contention that any interpretation of "export" which does not include a landing in a foreign country or at least a nonreturn to this country would defeat the purpose of the drawback statutes in exactly that fashion. We cannot agree.

In expounding one part of a statute resort should be had to every other part, *Nashville, C. & St. L. Ry., et al.* v. *State of Tennessee, et al.*, 262 U. S. 318, and that construction adopted which will render all parts harmonious. Paragraph 1615 (e) and (f) of the Tariff Act of 1930 as amended by the Customs Administrative Act of 1938 provides adequate and clear authorization for the Collector of Customs to prevent the duty free entry of once exported merchandise into domestic commerce. Such a provision has been continuously present in successive tariff acts since 1866 (14 Stat. 330) and has uniformly been admin-

istered to prevent just such an occurrence. *McGlinchy* v. *United States*, 4 Cliff. 312, 16 Fed. Cas. 118; *In re Schallenberger*, 72 Fed. 491; *United States* v. *American Railway Express Co.*, 11 C. C. P. A. (Customs) 505; T. D. 39659.

So far as we have been able to determine both the courts and the customs officials have uniformly defined the legal notion of exportation as a severance of goods from the mass of things belonging to this country with an intention of uniting them with the mass of things belonging to some foreign country. We have found no case wherein the necessity of a foreign landing was considered and hence have found no decision on that question.

The foregoing definition, so far as we are aware, first appeared in an opinion of the Solicitor General of the United States which was approved by the Attorney General in 1883 and is found in 17 Op. Attys. Gen. 579. It was the opinion of the Solicitor General that all exportation thus defined was attended with the chance that the intention might be changed after removal from this country, but that such change had no effect upon the character of the act. *So long as an immediate bona fide purpose to seek a foreign market coincides with a bona fide act of shipment later changes in either the intent or destination have no effect upon the original character of the act as an exportation.*

The Solicitor General's definition of exportation was quoted with approval by the Supreme Court of the United States in the case of *Swan & Finch Co.* v. *United States, supra.*

In *Flagler* v. *Kidd et al., supra,* the Second Circuit Court of Appeals considered the meaning of exportation and aligned itself with the foregoing definition. The act of exportation was set against the act of importation, the one being defined as a carrying out with intent to transfer to a foreign situs, the other as a bringing in with intent to land here. The intent was stated to characterize the act and determine its legal complexion.

In a case having facts somewhat similar to those in the case at bar, *McGlinchy* v. *United States, supra,* whisky was loaded upon a vessel at Boston and purportedly exported to St. Pierre, Miquelon. Before reaching St. Pierre the vessel returned to the United States and the whisky was clandestinely relanded. The contention was made that the merchandise was not shown to have been landed in any foreign country and that its relanding in the United States consequently did not constitute an importation within the meaning of the tariff act. The Circuit Court for the District of Maine held, however, that a landing in a foreign country was no prerequisite to reimportation and that the whisky was accordingly liable to duty under the reimportation section of the tariff act, 14 Stat. 330, the forerunner of paragraph 1615 of the Tariff Act of 1930, *supra.* This decision was cited as controlling

by the Board of Appraisers at New York in a similar case. *Saxon* v. *United States*, 2 Treas. Dec. 199, T. D. 21476.

The Bureau of Customs interestingly defines exportation (Sec. 25, Note 5, Customs Regulations of 1943) in almost the identical words used by the Solicitor General:.

An exportation is a severance of goods from the mass of things belonging to this country with the intention of uniting them to the mass of things belonging to some foreign country.

While such a definition establishes the character of an outbound shipment as an exportation or not at the time the merchandise leaves the United States, it does not completely eliminate subsequent events from consideration. A relanding in this country and the manner of that relanding might in a particular case be the most persuasive evidence of the purported exporter's original intent to export. In that manner a subsequent relanding might be determinative of the exportation-nonexportation question. In the case at hand, however, the government does not question the exporter's intent, and we deem it clearly established by the stipulated facts that his intent to export was bona fide.

We are of opinion that both the weight of authority and sound logic dictate that goods are exported in the sense of the drawback statute when they have been physically carried out of this country with the intention of uniting them with the goods of a foreign country.

It is our view that the United States Customs Court arrived at the right conclusion in directing the Collector of Customs to reliquidate the entries and allow drawback thereon, and its judgment in so doing is *affirmed*.