## CARPENTER et al. v. TEXAS & NEW ORLEANS R. CO.

## NORRIS GRAIN CO. v. SAME.

### Nos. 8116, 8117.

Circuit Court of Appeals, Fifth Circuit.

March 23, 1937.

Carl G. Stearns, of Houston, Tex., Charles M. Blackmar, of Kansas City, Mo., and James L. Coleman, of Chicago, Ill., for appellants.

Harry R. Jones and Tom M. Davis, both of Houston, Tex., for appellee.

Before FOSTER and SIBLEY, Circuit Judges, and HOLLAND, District Judge.

HOLLAND, District Judge.

This appeal involves a construction of certain emergency freight tariffs of joint commodity rates when for export only on wheat and wheat flour in straight carloads, the emergency being stated as follows:

"This emergency tariff is issued at the solicitation of the President of the United States. Due to the large carry-over from last season's wheat crop and the immediate prospects for a very large production this coming season, it has been urged that all interests involved, including the railroads, should assist in effecting a reduction of the surplus through exportation to avert, if possible, a lowering of prices. The essential consideration in the publication thereof is that the rates and regulations named herein shall expire with September 30, 1929, and are published in this manner so that the rates shall not be considered a precedent nor as an admission by the carriers that the rates in effect prior to this tariff are not reasonably low under existing laws and shall be construed only as indicative of the attitude of the carriers to assist the Administration in its program for relieving an emergency to the extent that this

abnormal reduction in rates may help the situation."

The shipments in question involved the rates as they applied to the Gulf Ports of Galveston, Houston, and Texas City, all in the state of Texas. The tariffs as issued were effective as of May 29, 1929, and expired September 30, 1929, between which dates all of the wheat involved in this controversy moved. The question presented is whether in order to receive the benefit of the lowered emergency rates the wheat must have been loaded upon ships at the Gulf ports on or before the 15th day of November, 1929.

The application of the emergency rates as to wheat which originated in the state of Texas,[1] and the application of the emergency rates as to wheat which originated at points outside of the state of Texas,[2] are stated in the tariff. Transit rules are incorporated in the tariff cover-

---

[1] "The rates in this supplement to the Texas Gulf Ports and Rio Grande Crossings named in Paragraph 3 of Item No. 300 are applicable only on Wheat and Wheat Flour, in straight carloads, for export to all Foreign Countries, except Canada, Prince Edward Island, New Brunswick, Nova Scotia, Newfoundland, Islands of Miquelon and St. Pierre, and will also apply on shipments exported to Insular Possessions of the United States, viz.: Philippine Islands, Hawaiian Islands, Virgin Islands, and Porto Rico, subject to the conditions herein specified."

"The charges resulting from the rates, rules and regulations shown herein will apply only when lower than the charges applicable to export Wheat and Wheat Flour, in straight carloads, from and to points named herein published in tariffs of individual lines parties hereto, or their agents, lawfully on file with the Interstate Commerce Commission and which have been amended to refer to this tariff."

"On and after October 1, 1929, the rates, rules and regulations applicable on Wheat and Wheat Flour, in straight carloads, for export will be those shown in the tariffs of individual lines parties hereto, or their agents, lawfully on file with the Interstate Commerce Commission, entirely unaffected by any of the rates or provisions shown in this supplement."

"Rates in this supplement will not apply on any shipment from any point of origin or transit point subsequent to September 30, 1929."

"Rates in this supplement will apply and charges will be collected on basis of such rates at time of shipment on direct consignments to Texas Gulf Ports and Rio Grande Crossings if proof of exportation is made at time of shipment."

"Where proof of exportation is not made at the time of shipment domestic rates will be charged. If shipment is actually exported on or before November 15, 1929, and evidence of that fact is furnished, charges will be reduced to the basis shown herein upon presentation of claim supported by original paid freight bill."

"Proof of exportation required under the preceding paragraph shall consist of ship's charter, contract of sale, or other satisfactory proof of actual sale for export, if actually exported on or before November 15, 1929."

[2] "(A) The rates named in this tariff apply on wheat and wheat flour, straight carloads, destined to Gulf Ports named in Item No. 10, and to Rio Grande crossings named in Item No. 10, when for export in countries listed in Item No. 25, whether moving beyond such destinations by rail, by water, or by water and rail, subject to the conditions herein specified."

"The rates in this tariff to Gulf Ports named in Item No. 10, and to Rio Grande crossings named in Item No. 10, are applicable only on wheat and wheat flour, in straight carloads, for export to countries listed in Item No. 25, subject to the conditions herein specified."

"The charges resulting from the rates, rules and regulations shown herein will apply only when lower than the charges applicable to export Wheat and Wheat Flour, in straight carloads, from and to points named herein, published in tariffs of individual lines parties hereto, or their agents, lawfully on file with the Interstate Commerce Commission, and which have been amended to refer to this tariff."

"On and after October 1, 1929, the rates, rules and regulations applicable on Wheat and Wheat Flour, in straight carloads, for export, will be those shown in the tariffs of the individual lines parties hereto, or their agents, which tariffs have been amended by making reference to this tariff."

"(B) The rates in this tariff will not apply on any shipment from any point of origin or transit point subsequent to September 30, 1929."

"(C) The rates in this tariff will not apply and charges will be collected on basis of such rates at time of shipment on direct consignments to Gulf Ports and Rio Grande crossings, if proof of exportation is made at time of shipment."

"Where proof of exportation is not

ing wheat for export which originated at points outside of the state of Texas.[3]

The shippers contend that such transit shipments of wheat for export, that is shipments from storage in terminal elevators against which in-bound tonnage may be applied, with the rate computed from the point of origin to the Gulf Ports, are not governed by the language of the tariffs limiting the application of the lowered emergency rates to wheat actually exported before November 15, 1929.

The purpose of the lowered emergency rates was to accomplish a lessened wheat supply in this country at a time when there was an unusual wheat supply, and with the prospects of a bumper crop the succeeding wheat harvesting season. The President's express purpose was to thus avert, if possible, a lowering of prices, and the means sought to accomplish this laudable end was exportation of the surplus. To accomplish this purpose, the co-operation of the railroad carriers was secured, with the permission of the Interstate Commerce Commission. Not only was the effectiveness of the emergency rates limited to certain dates, to wit, beginning May 29, 1929, and expiring September 30, 1929, but the tariffs evidence clearly the provision that the wheat must be actually exported on or before November 15, 1929, if the lowered rates were to apply.

This phrase "if actually exported on or before November 15, 1929," applied to the shipments in question, and not to domestic shipments. Proof of exportation must have been made at the time of shipment, and the constituent elements of "exportation" are specifically stated, and include the limitation as to actual exportation, with which provision the shipments in question did not comply.

■ A predetermined intention on the part of shippers to export is an important element in determining the character of commerce, whether domestic or foreign, but not to the exclusion of the giving of due consideration and effect to all parts of the contract of carriage.

In United States v. Chavez, 228 U.S. 525, 33 S.Ct. 595, 57 L.Ed. 950, a resolution of Congress making it unlawful to export arms or munitions of war from any place in the United States to any other strife ridden American country was under consideration. The words "to export" as used in the joint resolution of Congress were held subject to determination with reference to the text of the resolution itself, and they should not be interpreted by a mere abstract consideration of the meaning of the words. Exportation of the wheat in question may well be held to be complete when the inland journey commenced, under the provisions of section 9, article 1, of the Constitution, prohibiting the laying by Congress of a tax or duty "on Articles exported from any State," and of section 10, Article 1, forbidding any state, without the consent of Congress, to "lay any Imposts or Duties on Imports or Exports," yet, in the matter of carriage rates, the entire contract must be looked to, expressing the terms of the contract of carriage, by which the normal rates were lowered, with limitations and conditions as to dates of initiating the carriage, and granting a further period of time, to wit, from October 1, 1929, to November 15, 1929, a month and a half, within which actual exportation by loading on ships must be effected.

To apply the doctrine announced in Texas & N. O. R. R. Co. v. Sabine Tram Co., 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442, holding that lumber ordered, manufactured, and shipped for export constitutes foreign commerce, as applicable to the facts in the instant case, would do

made at the time of shipment domestic rates will be charged. If shipment is actually exported on or before November 15, 1929, and evidence of that fact is furnished, charges will be reduced to the basis shown herein upon presentation of claim supported by original paid freight bill."

"(D) Proof of exportation required under paragraph C above shall consist of ship's charter, contract of sale or other satisfactory proof of actual sale for export, if actually exported on or before date specified in paragraph C."

[3] "The rates in this tariff are subject to the transit rules and privileges accorded under the tariffs of the individual lines parties hereto, or their agents, provided that shipments from the transit points are forwarded in export traffic prior to October 1, 1929. If forwarded October 1, 1929, or later from the transit point, even though the in-bound shipment to the transit point was made during the effective period of this tariff the through rates from point of origin will be those in effect shown in the tariff of individual lines or their agents on file with the Interstate Commerce Commission."

violence to the tariff provisions governing the shipments in question, and would render meaningless the limitation of date for actual exportation. These shipments are entirely different from those in Western Union Tel. Co. v. Foster, 247 U.S. 105, 38 S.Ct. 438, 62 L.Ed. 1006, 1 A.L.R. 1278; Railroad Commission of Louisiana v. Texas & P. Ry. Co., 229 U.S. 336, 33 S.Ct. 837, 57 L.Ed. 1215; Chandler v. Pennsylvania R. R. Co. (D.C.) 9 F.(2d) 703; Illinois C. R. R. Co. v. Fuentes, 236 U.S. 157, 35 S.Ct. 275, 59 L.Ed. 517; Hohenberg v. Louisville & N. R. R. Co. (C.C.A.) 46 F. (2d) 952; McFadden v. Alabama G. S. R. R. Co. (C.C.A.) 241 F. 562; Carson Petroleum Co. v. Bial, 279 U.S. 95, 49 S.Ct. 292, 73 L.Ed. 626; Hughes Bros. Co. v. Minnesota, 272 U.S. 469, 47 S.Ct. 170, 71 L.Ed. 359; A. G. Spalding & Bros. v. Edwards, 262 U.S. 66, 43 S.Ct. 485, 67 L.Ed. 865.

It is a cardinal rule in the construction of contracts that effect should be given, if possible, to every word, phrase, clause, and sentence. Chicago, etc., Ry. Co. v. Farmers' Shipping Ass'n (C.C.A.) 59 F.(2d) 657.

Proof of exportation was required at the time of shipment, not merely the declared intention of the shipper to export, not merely the initiation of an export shipment, but this proof of exportation must consist, according to the tariff, of ship's charter, contract of sale, or other satisfactory proof of actual sale for export, and the further provision of actual exportation on or before November 15, 1929.

The subject-matter dealt with was of an emergency nature. The very reason for the tariffs' existence was exportation. Shippers were not misled by any vague or uncertain terms. The tariffs included no misleading terms calculated to mislead an ignorant shipper. The facts here are not similar to the case of Atlantic Coast Line Ry. Co. v. Atlantic Bridge Co. (C.C.A.) 57 F.(2d) 654. It was made quite clear that the shippers would obtain a lessened rate, and reasonable inquiry was required of them as to all limitations and restrictions placed on the right to enjoy the lessened rates. The tariffs are to be construed in the light of the circumstances existing at the time of issuance, St. Louis, I. M. & S. Ry. Co. v. Hasty & Sons, 255 U.S. 252, 41 S.Ct. 269, 65 L.Ed. 614; and are to be construed in a practical manner. Actual exportation was the desideratum. A month and a half was granted to accomplish the fulfillment and compliance with this requirement. The word "actual" was not an idle expression. The fact that exportation as generally meant might be held to attach is entirely consistent with the provision of the tariff that the exportation must be actual, and its actuality was further specified by the naming of a date, November 15, 1929, within which the exportation must become actual. The context requires that the word "actual" be given a meaning, and that meaning we hold is that which is expressed herein. The shippers seek to restrict the meaning of the words "proof of exportation" in the tariff applying to shipments from Texas points. The "proof of exportation" in unnumbered paragraph 7 of the application of emergency rates, referring to "proof of exportation" in unnumbered paragraph 6, under a reasonable interpretation, can be held only to mean the same "proof of exportation" in unnumbered paragraph 5. What we have said here is a reasonable construction of the whole tariff under the application of emergency rates, both as to shipments originating in the state of Texas, and shipments originating beyond the state of Texas.

With reference to the transit rules herein above referred to, it is clear that these transit rules and privileges which are accorded to shippers are made applicable to the rates of these emergency tariffs, with the provision as to the forwarding "in export traffic prior to October 1, 1929." The wheat shipments here in question were not "in export traffic" without due significance being given to all the terms of the tariff. The terms and conditions of the emergency rates are not modified, impaired, or lessened by reason of the granting of transit privileges.

The decision of the District Court is correct, and the judgments are affirmed.