**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Mohammad Reza EHSAN,**
**Defendant–Appellee.**

No. 98–4036.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 30, 1998.

Decided Dec. 15, 1998.

**ARGUED:** Andrew George Warrens Norman, Assistant United States Attorney, Richard Charles Kay, Assistant United States Attorney, Baltimore, Maryland, for Appellant. Joshua R. Treem, Schulman, Treem, Kaminkow & Gilden, P.A., Baltimore, Maryland, for Appellee. **ON BRIEF:** Lynne A. Battaglia, United States Attorney, Yosefi M. Seltzer, Third Year Law Student, Baltimore, Maryland, for Appellant. Harry Levy, Schulman, Treem, Kaminkow & Gilden, P.A., Baltimore, Maryland; Steven A. Steinbach, Julie C. Hilden, Williams & Connolly, Washington, D.C., for Appellee.

Before WILKINSON, Chief Judge, WIDENER, Circuit Judge, and WILSON, Chief United States District Judge for the Western District of Virginia, sitting by designation.

Reversed and remanded by published opinion. Chief Judge WILKINSON wrote the opinion, in which Judge WIDENER and Chief Judge WILSON joined.

## OPINION

WILKINSON, Chief Judge:

Mohammad Reza Ehsan was indicted for shipping equipment in violation of a ban on exports to Iran. *See* Exec. Order No. 12959, 60 Fed.Reg. 24757 (1995). Ehsan claimed that Executive Order 12959 and its implementing regulations, 31 C.F.R. §§ 560.203–.205, .406, were ambiguous. The district court agreed and, applying the rule of lenity, dismissed two counts of Ehsan's indictment. We hold that the Executive Order and the Iranian Transactions Regulations are not ambiguous. We therefore reverse the judgment of the district court and remand this case with instructions to reinstate counts two and three of Ehsan's indictment.

### I.

On March 15, 1995, President Clinton announced "that the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." Exec. Order No. 12957, 60 Fed.Reg. 14615 (1995). Invoking the authority of the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.*, the President declared a national emergency to deal with that threat. Two months later the President issued Executive Order 12959, which bans most importation, exportation, and reexportation of goods between the United States and Iran. 60 Fed.Reg. 24757 (1995).

To implement these Executive Orders the Office of Foreign Assets Control (OFAC) promulgated the Iranian Transactions Regulations, 31 C.F.R. Part 560. With regard to exports and reexports, the regulations declare that:

Except as otherwise authorized ... the exportation from the United States to Iran or the Government of Iran, or the financ-

ing of such exportation, of any goods, technology, or services is prohibited.

31 C.F.R. § 560.204.

Except as otherwise authorized ... the reexportation to Iran or the Government of Iran of any goods or technology exported from the United States, the exportation of which to Iran was subject to export license application requirements under any United States regulations in effect immediately prior to May 6, 1995, is prohibited, unless the reexportation is of goods that have been substantially transformed outside the United States, or incorporated into another product outside the United States and constitute less than 10 percent by value of that product exported from a third country.

*Id.* § 560.205.

Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited.

*Id.* § 560.203. These regulations largely track the language of Executive Order 12959. OFAC also issued a number of interpretive regulations, including one as to transshipments:

The prohibitions in § 560.204 apply to the exportation from the United States, for transshipment or transit, of goods which are intended or destined for Iran.

*Id.* § 560.406(b).

This case presents a challenge to an indictment for violations of the Iranian Transactions Regulations and Executive Order 12959. According to the indictment, Mohammad Reza Ehsan made two attempts between May 1995 and May 1996 to order Transformer Oil Gas Analysis Systems (TOGAS) from Shimadzu Scientific Instruments, Inc., for shipment directly or through third countries to Iran. Shimadzu rebuffed Ehsan, citing the Iranian export ban.

In May 1996 Ehsan again attempted to order two TOGAS from Shimadzu, this time to be sent to Dubai, United Arab Emirates(U.A.E.). He presented Shimadzu two

checks in October 1996 in payment for the two TOGAS and asked Shimadzu to ship the systems to his agent in Newark, New Jersey. According to the government, customs agents then created a dummy package and caused the shipment to be sent to Rome, Italy. When Shimadzu informed Ehsan that the package had been sent to Rome, Ehsan had it forwarded to Dubai. After the package arrived in the U.A.E. federal agents arrested Ehsan.

Ehsan was indicted for violating Executive Order 12959 and 31 C.F.R. §§ 560.203, 560.204, and 560.406(b), as well as for conspiracy and for making false statements to an agency of the United States. Ehsan challenged the indictment, claiming that the Executive Order and its implementing regulations were ambiguous. Noting that neither the Executive Order nor the regulations define "export," "reexport,"or "transshipment," Ehsan argued that his shipment to Dubai and his planned shipment on to Iran was a permissible "reexport,"[1] not an impermissible "export" and "transshipment." The district court agreed that the Executive Order and its implementing regulations were ambiguous and, applying the rule of lenity, adopted Ehsan's proposed definitions. The district court then dismissed counts two and three of the indictment, which charged violations of the export ban, leaving only the conspiracy and false statement counts. The government appeals.

## II.

■ In dismissing Ehsan's indictment, the district court thought itself bound to select the narrowest of the proffered definitions of "export" and "transship," since "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) (internal quotation marks omitted). It is not the case, however, that a provision is " 'ambiguous' for purposes of lenity merely because it [is] *possible* to articulate a construction more narrow than that urged by the Government."

---

1. Because TOGAS were not "subject to export license application requirements under any United States regulations in effect immediately prior

to May 6, 1995," 31 C.F.R. § 560.205, they were exempt from the reexportation ban in 1996.

*Moskal v. United States,* 498 U.S. 103, 108 (1990). Rather, there must be a "grievous ambiguity or uncertainty in the language and structure of the Act, such that even after a court has seize[d] everything from which aid can be derived, it is still left with an ambiguous statute." *Chapman v. United States,* 500 U.S. 453, 463, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (citations omitted); *see also United States v. Kahoe,* 134 F.3d 1230, 1234 (4th Cir.1998). Courts must exhaust the tools of statutory construction in this search for statutory meaning. *See Moskal,* 498 U.S. at 108, 111 S.Ct. 461; *Kahoe,* 134 F.3d at 1234; *United States v. Wildes,* 120 F.3d 468, 471 (4th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 885, 139 L.Ed.2d 873 (1998). The rule of lenity is a last resort, not a primary tool of construction; it ought to be employed only where a provision's language, structure, and purpose fail to illuminate its meaning. In this case, these traditional interpretive tools resolve any ambiguity in the Executive Order and Iranian Transactions Regulations.

### III.

We begin with the language of the Executive Order and the Iranian Transactions Regulations. The embargo prohibits "the exportation from the United States to Iran" of any goods, technology, or services, Exec. Order No. 12959; 31 C.F.R. § 560.204, including "the exportation ... for transshipment or transit, of goods which are intended or destined for Iran," 31 C.F.R. § 560.406(b). "Export" is the critical term. This single word gives notice of what behavior the regulations prohibit.

"Export" is also a clear term. The Executive Order and regulations do not define "export" or "exportation," but their ordinary meaning is manifest. "Exportation" has been defined as "the act of exporting; the sending of commodities out of a country, typically in trade," *The Random House Dictionary of the English Language* 682 (2d ed.1987), "the act of sending or carrying goods and merchandise from one country to another," *Black's Law Dictionary* 579 (6th ed.1990), and "a severance of goods from [the] mass of things belonging to [the] United States with [the] intention of uniting them to [the] mass of things belonging to some foreign country," *id.* The verb "export" it-

self means "to ship (commodities) to other countries or places for sale, exchange, etc.," *Random House* at 682, "to carry or send abroad," *Black's* at 579, and "to send, take, or carry an article of trade or commerce out of the country," *id.* These definitions vary in specificity, but all make clear that exportation involves the transit of goods from one country to another for the purpose of trade.

Common-law usage confirms this ordinary definition. Nearly a century ago the Supreme Court declared that "the word 'export' as used in the Constitution and laws of the United States, generally means the transportation of goods from this to a foreign country." *Swan & Finch Co. v. United States,* 190 U.S. 143, 145, 23 S.Ct. 702, 47 L.Ed. 984 (1903). More specifically, the meaning "of exportation is a severance of goods from the mass of things belonging to this country with an intention of uniting them to the mass of things belonging to some foreign country or other." *Id.* (internal quotation marks omitted). Courts have applied similar definitions in those rare cases joining issue on the meaning of the term—not only in the customs and duties arena, *see, e.g., United States v. Hill,* 34 F.2d 133, 135 (2d Cir.1929); *Citronelle–Mobile Gathering, Inc. v. Edwards,* 669 F.2d 717, 719(Temp. Emer. Ct.App.1982); *United States v. National Sugar Ref. Co.,* 39 C.C.P.A. 96,98–101 (1951); *see also United States v. 1903 Obscene Magazines,* 907 F.2d 1338, 1342 (2d Cir.1990), but also in a context directly analogous here—the interpretation of a congressional weapons embargo, *see United States v. Chavez,* 228 U.S. 525, 530, 33 S.Ct. 595, 57 L.Ed. 950 (1913) (considering only the actus reus).

Throughout this history "exportation" has consistently meant the shipment of goods to a foreign country with the intent to join those goods with the commerce of that country. "The intent characterizes the act, and determines its legal complexion." *Flagler v. Kidd,* 78 F.341, 344 (2d Cir.1897). If Ehsan's bona fide purpose was to seek a market in Dubai, then this was an exportation to the U.A.E. *See National Sugar Ref. Co.,* 39 C.C.P.A. at 100. If, however, he intended to seek a market in Iran, then the shipment fits the plain meaning of an "exportation" to

Iran. Exec. Order No. 12959; 31 C.F.R. § 560.204.

This is consistent with the purpose of the Executive Order. The President issued the order "to deal with [Iran's] unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." Exec. Order No. 12959. The order is clothed with the most serious of purposes, and it is couched in the broadest of terms. It prohibits, with only limited exceptions, the exportation "of *any* goods, technology . . ., or services," the reexportation "of *any* goods or technology," the entering into "*any* transaction . . . by a United States person relating to goods or services of Iranian origin," and "*any* new investment by a United States person in Iran." *Id.* (emphasis added). Moreover, it bars "*any* transaction . . . that evades or avoids" its restrictions. *Id.* (emphasis added). The obvious purpose of the order is to isolate Iran from trade with the United States.

Consistent with the plain meaning of the term "export," the Executive Order intended to cut off the shipment of goods intended for Iran. This broad export ban reflected the President's appraisal of the nation's interest in sanctioning Iran's sponsorship of international terrorism, its frustration of the Middle East peace process, and its pursuit of weapons of mass destruction. *See* Message to Congress on Iran, 31 *Weekly Comp. Pres. Doc.* 1584 (Sept. 25, 1995). In the absence of a "grievous ambiguity," to apply the rule of lenity would be to take this important foreign policy decision out of the hands of the Executive and put it in those of the courts.

## IV.

■ Ehsan makes several arguments for the dismissal of his indictment. First, he maintains that the TOGAS shipment was not an impermissible export to Iran, but rather a permissible export to the U.A.E. and reexport to Iran. Ehsan insists that the govern-

ment may not prosecute him for an export to Iran when he reasonably could have thought he was engaged in reexportation. Although Ehsan labors mightily to manufacture a textual ambiguity, his reading of the regulations is not a reasonable one. "Reexport" simply means "to export again." *Random House* at 1619. Ehsan's transaction may indeed have constituted a reexport, if he shipped the TO-GAS with the purpose of joining them with the commerce of the U.A.E. and then shipped them from the U.A.E. with the intent to join them with the commerce of Iran. Or it may not, if the stop in Dubai was merely an intermediate step—or transshipment—in the TOGAS' intended journey to Iran. This, however, is a question for the jury, not an ambiguity in the regulatory scheme.

■ Ehsan also places great weight on the fact that the TOGAS cleared customs in Dubai. Once the shipment cleared customs, he argues, the "export" to the U.A.E. was complete. Customs clearance, however, is simply another fact for the jury to weigh in determining whether Ehsan intended to export the goods to Dubai or to Iran—just as his bills of lading, his purchase orders, and the situs of his ultimate customer certainly will be. *See United States v. Hercules Antiques*, 44 C.C.P.A. 209, 213–15 (1957).

■ Finally, Ehsan claims that Executive Order 13059—issued in 1997 "to clarify the steps taken in Executive Orders 12957 . . . and 12959"—demonstrates that the earlier order is ambiguous. 62 Fed.Reg. 44531 (1997). It is true that Executive Order 13059 states its prohibitions in a more comprehensive manner than does Executive Order 12959. It also imposes a more comprehensive embargo—for instance, by eliminating the safe harbor for non-sensitive reexports. *See* Exec. Order No. 13059 § 2.[2] To that end, the 1997 order restates and expands the embargo to include all exportation and reex-

---

**2.** Section 2(a) prohibits:

    the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person

in a third country undertaken with knowledge or reason to know that:

    (i) such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran. . . .

Exec. Order No. 13059.

portation, direct and indirect, with the specific destination of Iran. This rephrasing of the language and scope of the export ban, however, does not undermine the simple, unambiguous bar in Executive Order 12959 of all "exportation . . . to Iran." To so hold would be to discourage the President and Congress from rephrasing or updating their regulations.

## V.

Because Executive Order 12959 and the Iranian Transactions Regulations are not ambiguous, the district court erred in applying the rule of lenity to narrow their scope. Ehsan's due process and vagueness challenges fail for the same reason. We therefore reverse the judgment of the district court and remand the case with instructions to reinstate counts two and three of the indictment.

*REVERSED AND REMANDED.*