Revised May 4, 2001

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-30151
_____


UNITED STATES OF AMERICA


                        Plaintiff - Appellee

        v.

DIEN DUC HUYNH


                        Defendant - Appellant

_____

        Appeal from the United States District Court
            for the Western District of Louisiana
_____
                        March 30, 2001

Before KING, Chief Judge, and HIGGINBOTHAM and DUHÉ, Circuit
Judges.

KING, Chief Judge:

    Defendant-Appellant Dien Duc Huynh was convicted by a jury
on one count of conspiracy to commit theft of government
property, two counts of violating the Trading with the Enemy Act,
one count of conspiracy to violate the Export Administration Act,
seven counts of exporting military equipment in violation of the
Export Administration Act, and two related forfeiture counts.
Dien argues first that the jury instructions on the Trading with

the Enemy Act violations were erroneous.  Additionally, Dien
contends that the evidence was insufficient to support the guilty
verdicts on any of the charges.  We AFFIRM.


## I.  FACTUAL AND PROCEDURAL HISTORY

Dien Duc Huynh is the owner of Dien's Auto Salvage, Inc.,[1]
located in Lafayette, Louisiana.  The issues on appeal arise from
the defendant's involvement, in 1993 and 1994, in the purchase of
surplus military equipment and its subsequent shipment to
Vietnam.  The case is complicated by the fact that although
Vietnam was subject to a trade embargo by the United States in
1993 and part of 1994, that embargo, which supports the basis of
several of the charges against the defendant, was lifted by the
President of the United States on February 3, 1994.

On September 9, 1998, a federal grand jury returned a
fourteen-count indictment against Dien and Dien's Auto Salvage.
Count One, which charged the defendant with conspiracy to commit
theft of government property in violation of 18 U.S.C. § 371, was
based on Dien's purchase of surplus military jeeps and his
failure to mutilate certain parts of those jeeps as required by
the sales contract for title to pass to the purchaser.  Count Two

---

[1]  The indictment also charged another defendant, Son Kim
Nguyen, with Counts Three through Fourteen of the indictment, as
described infra in the text.  Son Kim Nguyen pleaded guilty prior
to trial and testified as a witness at trial.  Furthermore, for
purposes of this appeal, "Dien" or the "defendant" refers to Dien
and Dien's Auto Salvage.

charged Dien with knowingly and willfully making a false statement, in violation of 18 U.S.C. § 1001, by certifying that he was a medical doctor in order to purchase medical equipment. Counts Three and Four charged the defendant with violating the Trading with the Enemy Act, specifically with violating 50 U.S.C. app. §§ 5 and 16, and 31 C.F.R. § 500.201(b)(1), based on the defendant's shipments of military vehicles and parts to Vietnam, an embargoed country, without a validated export license. Count Six charged the defendant with conspiracy to violate the Export Administration Act, in violation of 18 U.S.C. § 371, for agreeing with Son Kim Nguyen ("Son Kim") and others to ship military vehicles and parts that required a validated export license to Vietnam without such license. Counts Seven through Thirteen charged the defendant with substantive counts of exporting military equipment in violation of 50 U.S.C. app. § 2410(a) of the Export Administration Act for seven separate shipments of military vehicles to Vietnam without a validated export license.[2]

A jury trial commenced on May 24, 1999. At the close of the government's case in chief, Dien filed an oral motion for judgment of acquittal, which was denied by the court. On May 26, 1999, the jury returned a verdict acquitting Dien on Count Two, but finding the defendant guilty on Counts One, Three, Four, Six, and Seven through Thirteen. On May 27, 1999, Dien pleaded guilty

---

[2] Although the embargo was lifted on February 3, 1994, the licensing requirements for certain products were still in effect.

3

on the two forfeiture counts, reserving the right to appeal his convictions.[3]

## II. Objection to the Jury Instruction

Dien contends that the jury instructions concerning the Trading with the Enemy Act violations were erroneous in that they did not take into account the changes in the law wrought by the lifting of the embargo against Vietnam. He asserts that 31 C.F.R. § 500.201(c), which prohibits individuals from using third countries as conduits to export goods to an embargoed country, ceased to apply when the embargo was lifted. He submits, therefore, that the shipment of goods from the United States to the non-embargoed third country could not be a violation of the Trading with the Enemy Act. He argues that in this rare case, where the embargo was lifted prior to the arrival of the goods in the embargoed country, the government was required to prove that the goods were shipped from the United States to Vietnam with the specific intent that the goods arrive in Vietnam while the embargo was still in effect. Specifically, Dien argues that the portion of the instruction that informed the jury that "proof that the commodities actually arrived in the country of Vietnam

_____

[3] Counts Five and Fourteen were forfeiture provisions, requiring the defendant to forfeit Dien's Auto Salvage and all proceeds resulting from the violations. A jury trial was held on the forfeiture counts on May 27, 1999; however, the defendant pleaded guilty before the jury returned its verdict.

4

is not required for an export to have occurred" was erroneous.[4]

[4]    The relevant portions of the jury instructions given for the Trading with the Enemy Act violations are as follows:

Counts II and III [sic] charge the defendants with exporting military vehicles and vehicle parts to Vietnam in violation of the Trading with the Enemy Act. Title 50, United States Code, Appendix 5 and 16 gives the President of the United States authority to regulate or prohibit the importing, exporting, or otherwise dealing with property in which a foreign company or foreign national has an interest.
     For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt: First, that the defendants exported goods to the country of Vietnam. Second, that at the time of the exporting, the United States had an embargo against the Country of Vietnam under the Trading with the Enemy Act. Third, that the defendants exported goods without first obtaining a license from the Department of Commerce. Fourth, the defendant acted knowingly and willfully. That is, when he exported the goods to Vietnam, he was acting voluntarily and purposefully with a specific intent to do something the law forbids. That is to say, with bad purpose either to disobey or disregard the law.
     In Counts III and IV of the indictment, the United States has charged the defendant with exporting commodities to Vietnam in violation of the Trading with the Enemy Act. I instruct you that an export includes a transfer to any person or entity of goods or technology within the United States with the knowledge or intent that the goods or technology will be shipped, transferred, or transmitted to an unauthorized recipient. Consequently, proof that the commodities actually arrived in the country of Vietnam is not required for an export to have occurred.
     . . . . I do instruct you that between April of 1975 and February 3rd of 1994 the United States had an embargo against the country of Vietnam under the Trading with the Enemy Act. The word knowingly, as this term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally, not because of mistake or accident. You may find the defendant had knowledge of a fact if you find that the defendant deliberately closed his

We find that the charge was not erroneous in instructing jurors as to either the act or the mental state required to violate the Trading with the Enemy Act.

We review challenges to jury instructions for only an abuse of discretion.  Battle v. Memorial Hosp. at Gulfport, 228 F.3d 544, 555 (5th Cir. 2000).  The standard of review applied to a defendant's claim that the jury instruction was erroneous is "'whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of the law applicable to the factual issues confronting them.'"  United States v. Wise, 221 F.3d 140, 147 (5th Cir. 2000) (quoting United States v. Sharpe, 193 F.3d 852, 871 (5th Cir. 1999)).  "A district court has broad discretion in framing the instructions to the jury and this Court will not reverse unless the instructions taken as a whole do not correctly reflect the issues and law."  United States v. McKinney, 53 F.3d 664, 676 (5th Cir. 1995).

Dien was charged with violating §§ 5 and 16 of the Trading with the Enemy Act of 1917 (the "TWEA"), 50 U.S.C. app. §§ 1-44 (1990), and its underlying regulations, specifically 31 C.F.R.

---

eyes to what would otherwise have been obvious to him. While knowledge on the part of the defendant could not be established merely be [sic] demonstrating the defendant was negligent, careless, or foolish, knowledge could be inferred if the defendant deliberately blinded himself to the existence of a fact.

§ 500.201.  Section 5 of the TWEA authorizes the President, or an agency he delegates, in specific circumstances,[5] to regulate or prohibit various transactions involving any property in which a designated foreign country or national of that foreign country has an interest.  See 50 U.S.C. app. § 5(b).[6]  The President has

---

[5]  Currently, the President may use his economic powers under the TWEA only during times of war, as was the case when the TWEA was originally enacted.  See Act of Oct. 6, 1917, ch. 106, 40 Stat. 411.  In 1933, the President's authority was expanded to deal with both wartime and peacetime national emergencies.  See Act of Mar. 9, 1933, ch. 1, 48 Stat. 1.

In 1977, the President's power was again limited to use only during wartime.  See Act of Dec. 28, 1977, Pub. L. 95-223, § 101(a), 102, 91 Stat. 1625 (substituting "During the time of war, the President may . . ." for "During the time of war or during any other period of national emergency declared by the President, the President may . . .").  However, the 1977 amendments limiting the President's use of this authority to times of war also allowed the President to continue to exercise any "authorities" that had been executed by the President as a result of a national emergency prior to the amendment.  See id. § 101(b),(c).  Because the embargo against Vietnam predated the 1977 amendments, the President was allowed to, and did, continue it.  See, e.g., Presidential Determination No. 93-38: Extension of the Exercise of Certain Authorities Under the Trading with the Enemy Act, 58 Fed. Reg. 51209 (signed on Sept. 13, 1993) (extending for one additional year the presidential authorities under the Trading with the Enemy Act).

For a more complete history of the TWEA, see Regan v. Wald, 468 U.S. 222, 225-30 (1984); Miranda v. Secretary of the Treasury, 766 F.2d 1, 2-5 (1st Cir. 1985).

[6]  50 U.S.C. app. § 5(b) provides in relevant part:

(1) During the time of war, the President may, through any agency that he may designate, and under such rules and regulations as he may prescribe, by means of instructions, licenses, or otherwise—
. . . .
(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or

7

delegated that authority to the Secretary of the Treasury, who has in turn delegated it to the Office of Foreign Assets Control ("OFAC"). See Regan v. Wald, 468 U.S. 222, 226 n.2 (1984). Furthermore, 50 U.S.C. app. § 16 criminalizes violations of the TWEA and the regulations issued under it. See 50 U.S.C. app. § 16.[7]

Pursuant to its authority under the TWEA, OFAC promulgated 31 C.F.R. § 500.201, which provides:

> (b) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings,

---

> exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest, by any person, or with respect to any property, subject to the jurisdiction of the United States . . . .

50 U.S.C. app. § 5.

[7]   Section 16 provides in relevant part:

(a) Whoever shall willfully violate any of the provisions of this Act [sections 1 to 6, 7 to 39 and 41 to 44 of this Appendix] or of any license, rule, or regulation issued thereunder, and whoever shall willfully violate, neglect, or refuse to comply with any order of the President issued in compliance with the provisions of the Act [said sections] shall, upon conviction, be fined not more than $1,000,000, or if a natural person, be fined not more than $100,000, or imprisoned for not more than ten years or both; and the officer, director, or agent of any corporation who knowingly participates in such violation shall, upon conviction, be fined not more than $100,000 or imprisoned for not more than ten years or both.

50 U.S.C. app. § 16 (alterations in original).

8

> instructions, licenses, or otherwise, if such transactions involve property in which any <u>designated foreign country</u>, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect: (1) <u>All dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States</u>; and (2) All transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States. (c) <u>Any transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions set forth in paragraph (a) or (b) of this section is hereby prohibited.</u>

31 C.F.R. § 500.201(b) (2000) (emphasis added). Simply stated, the regulation prohibits specific transactions of property, including exportation, in which a "designated foreign country" or national of that country has an interest, unless authorized by the Secretary of the Treasury. North Vietnam became a "designated foreign country" on May 5, 1964; South Vietnam became one on April 30, 1975. <u>Id.</u> § 500.201 schedule (3), (4).

The President lifted the embargo against Vietnam on February 3, 1994. <u>See id.</u> § 500.578; Foreign Assets Control Regulations; Prospective Lifting of Vietnam Embargo, 59 Fed. Reg. 5696 (Feb. 7, 1994). The lifting of the embargo did not apply retroactively. <u>See</u> Foreign Assets Control Regulations; Prospective Lifting of Vietnam Embargo, 59 Fed. Reg. at 5696. Therefore, while we agree with Dien that upon the lifting of the embargo, the prohibitions contained in 31 C.F.R. § 500.201(b) and (c) as pertaining to Vietnam were eliminated, the essential

9

element of that statement is that they were eliminated when the embargo was lifted and not before. The question remains whether the jury instructions were erroneous in light of the fact that Dien's activities spanned the time period before and after the embargo was lifted. We find that they were not.

Dien admits that proof that the goods actually arrived in the embargoed country was not required to prove a violation of the TWEA prior to the lifting of the embargo, even if the goods were shipped to the embargoed country using a third country as a conduit. The Court of Appeals for the Fourth Circuit analyzed a related question in United States v. Ehsan, 163 F.3d 855 (4th Cir. 1998). The defendant in Ehsan was indicted for shipping equipment in violation of a ban on exports to Iran. See id. at 856. He claimed that Executive Order 12959 and its implementing regulations were ambiguous.[8] The regulations enacted by OFAC

---

[8] The Iranian Transactions Regulations were promulgated to implement Executive Orders 12957 and 12959, which ban most importation, exportation, and reexportation of goods between the United States and Iran. See Ehsan, 163 F.3d at 856. The President issued the Executive Orders under the authority of the International Emergency Economic Powers Act ("IEEPA"), the language of which is similar to the language of the TWEA. Compare 50 U.S.C. app. § 5, with 50 U.S.C. §§ 1701, 1702.

The IEEPA authorizes the President, in the event of a national emergency, see 50 U.S.C. § 1701, to "investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest; by any person or with respect to any property, subject to the jurisdiction of the United States." Id. § 1702(a)(1)(B).

10

prohibited the exportation, reexportation, and transshipment of goods from the United States to Iran, unless authorized, or any transaction that evaded or avoided those prohibitions.  See id. at 856-57.  In Ehsan, the defendant attempted to ship goods from the United States to Rome, from Rome to the United Arab Emirates ("U.A.E."), and from the U.A.E. to Iran.  Id. at 857.  He was arrested when the goods arrived in the U.A.E.  The defendant argued that the "shipment was not an impermissible export to Iran, but rather a permissible export to the U.A.E. and reexport to Iran."  Id. at 859.  The court disagreed, stating that the meaning of export was clear and finding support for that assertion in both the ordinary meaning of the word[9] and its

_____

Similarly, the TWEA authorizes the President to "investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest, by any person, or with respect to any property, subject to the jurisdiction of the United States."  50 U.S.C. app. § 5(b).

[9]    See Ehsan, 163 F.3d at 858 (citing The Random House Dictionary of the English Language 682 (2d ed. 1987), defining "exportation" as "'the act of exporting; the sending of commodities out of a country typically in trade,'" and Black's Law Dictionary 579 (6th ed. 1990), defining "exporting" as "'the act of sending or carrying goods and merchandise from one country to another'" and as "'a severance of goods from [the] mass of things belonging to [the] United States with [the] intention of uniting them to [the] mass of things belonging to some foreign country'") (alterations in original).

11

common-law usage.[10]  See id. at 858-59.  The Fourth Circuit

determined that the meaning of "exportation" "has consistently

meant the shipment of goods to a foreign country with the intent

to join those goods with the commerce of that country."  Id. at

858.  By that definition, exportation does not require proof that

the goods actually arrived in the foreign country.

Other cases from our sister circuits support the finding

that "exportation" does not require the actual arrival of the

goods in the foreign country.  In United States v. One 1980

Mercedes Benz 500 SE, the Court of Appeals for the Ninth Circuit

held, in interpreting a forfeiture statute, that "[e]xportation

occurred as soon as the machines were delivered to a carrier for

shipment abroad."  772 F.2d 602, 605 (9th Cir. 1985).  The court

found that the goods "entered the export stream at the baggage

check-in at Los Angeles International Airport," because "an

international airport is the functional equivalent of a border,

and . . . luggage checked at that point of embarkation is at all

times thereafter in international transit."  Id.  Similarly, in

United States v. Ajlouny, the Court of Appeals for the Second

Circuit stated that "[a] shipment is sufficiently 'in foreign

commerce' for purposes of § 2314 once property bound for a

---

[10]  See id. (citing, inter alia, Swan & Finch Co. v. United States, 190 U.S. 143, 145 (1903), United States v. Chavez, 228 U.S. 525, 530 (1913), and United States v. Hill, 34 F.2d 133, 135 (2d Cir. 1929)).

foreign destination arrives in a [U.S.] customs area."[11]  629

F.2d 830, 837 (2d Cir. 1980).

We agree that the term exportation does not require that the

merchandise actually arrive in the foreign country.  Exportation

occurs when the goods are shipped to another country with the

intent that they will join the commerce of that country, not when

they arrive in that country.[12]  The regulations that prohibit

exporting goods to Vietnam remained in effect until the moment

---

[11]  At the time, 18 U.S.C. § 2314 provided: "'Whosoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, . . . knowing the same to have been stolen . . . , (s)hall be fined not more than $10,000 or imprisoned not more than ten years or both.'"  Ajlouny, 629 F.2d at 836.

[12]  We note, from Ehsan, One 1980 Mercedes Benz, and Ajlouny, that there is some confusion as to when exportation begins (e.g., when the goods are delivered to the carrier or to the customs station); however, as between these two options, we need not determine the precise moment exportation occurs.  The evidence shows that the first carton of goods was shipped out of the United States and actually arrived in Singapore before the embargo was lifted.  The second carton had an estimated departure date of January 11, 1994, an estimated arrival date (in Singapore) of February 8, 1994, and was loaded onto a ship (bound for Vietnam) in Singapore on February 11, 1994.  Because the voyage from California to Singapore takes approximately one month, these facts permit the inference that the cartons passed through a customs area in the United States prior to the lifting of the embargo on February 3, 1994.  Although the jury was instructed that "an export includes a transfer to any person or entity of goods or technology within the United States with the knowledge or intent that the goods or technology will be shipped, transferred, or transmitted to an unauthorized recipient," even if exportation does not occur until the goods arrive at the customs station, such error is harmless.  See Thomas v. Tex. Dep't of Criminal Justice, 220 F.3d 389, 395-96 (5th Cir. 2000) ("[E]ven erroneous jury instructions will not require reversal if based upon the entire record the challenged instruction could not have affected the outcome of the case.").

13

the embargo was lifted. The jury instruction clearly instructed jurors as to the act required to violate the embargo. Therefore, the instruction that "proof that the commodities actually arrived in the country of Vietnam is not required for an export to have occurred" was not an abuse of discretion.

Dien is, in essence, arguing that the instructions inadequately defined the correct mental state for a violation of the TWEA, taking into account the timing of the lifting of the embargo. Dien argues that because the embargo was lifted, the government should have been required to prove that the goods were shipped from the United States with the intent that they arrive in Vietnam while the embargo was in effect. However, that is not the mental state required to prove a violation of the TWEA. For a conviction under the TWEA, "the government must prove that appellants 'had knowledge of [the restrictions] and acted with the specific intent to circumvent those requirements.'" United States v. Tooker, 957 F.2d 1209, 1213-14 (5th Cir. 1992) (alteration in original) (quoting United States v. Granda, 565 F.2d 922, 924 (5th Cir. 1978). "Proof that the defendant negligently failed to investigate the regulations does not sufficiently prove requisite mens rea." Id. at 1214. "The government, however, need not show that appellants had knowledge of the specific regulations governing transactions with Vietnamese nationals." Id. "Rather, the government must prove only that the defendants knew that their planned conduct was

14

legally prohibited and that they therefore acted with an 'evil-meaning mind.'"  Id. (quoting Morissette v. United States, 342 U.S. 246, 251 (1952)).

The jury was instructed that it had to find that the goods were exported to Vietnam without a license while the United States had an embargo against the country of Vietnam and that the defendant was acting "voluntarily and purposefully with a specific intent to do something the law forbids.  That is to say, with bad purpose either to disobey or disregard the law."  Furthermore, the jury was informed that the United States had an embargo against Vietnam between April 1975 and February 3, 1994.  Dien was free to argue, and the jury was free to find, that although the goods were exported during the embargo, they were not exported with the intent to violate the embargo, but rather were exported to take advantage of the fact that the embargo was to be lifted.[13]

The instructions were not an abuse of discretion.

### III.  SUFFICIENCY OF THE EVIDENCE CLAIMS

---

[13]  Furthermore, although Dien argues that it was common knowledge that the embargo was about to be lifted, as late as February 2, 1994, the President stated, regarding the lifting of the embargo, "I've not made a final decision, but we are reviewing it and will be reviewing it over the next couple of days."  President's Remarks in Photo Op with Bipartisan Leadership 02-02-94, Feb. 2, 1994, available at 1994 WL 27289.

15

Dien also argues that there was insufficient evidence to support his convictions. "We review the sufficiency of the evidence by examining all the evidence in the light most favorable to the verdict."[14] United States v. Guerrero, 234 F.3d 259, 261-62 (5th Cir. 2000). "We will affirm if the evidence is such that a rational trier of fact could have found the requisite elements of the offense beyond a reasonable doubt." Id. at 262. "'Direct and circumstantial evidence are given equal weight, and the evidence need not exclude every reasonable hypothesis of innocence.'" United States v. Mendoza, 226 F.3d 340, 343 (5th Cir. 2000) (quoting United States v. Gonzales, 79 F.3d 413, 423 (5th Cir. 1996)).

### A. Violations of the Trading with the Enemy Act

The convictions on Counts III and IV arise from the shipment of two containers of goods from Dien's Auto Service in Lafayette to Singapore and their ultimate placement on a boat bound for Vietnam. The first container ("C-1") was picked up by the shipper from Dien's Auto Service on December 8, 1993, loaded on board a vessel in Long Beach, California on December 28, 1993,

---

[14] While it is unclear if Dien is challenging the sufficiency of the evidence or appealing the denial of his motion of acquittal, the standard of review is the same. See United States v. Wise, 221 F.3d 140, 154 (5th Cir. 2000) (stating that a challenge to a motion of acquittal "is in effect a challenge to the sufficiency of evidence used to convict" and is reviewed de novo).

16

arrived in Singapore, and was then off-loaded in Singapore on January 29, 1994 onto a vessel bound for Vietnam. The second container ("C-2") was picked up from Dien's Auto Service on December 13, 1993, loaded on board a vessel in California on January 11, 1994, arrived in Singapore, and was then off-loaded onto a new vessel bound for Vietnam on February 15, 1994.

As discussed in Part II supra, to prove a violation of the TWEA, "[t]he government must prove that appellants 'had knowledge of [the restrictions] and acted with the specific intent to circumvent those requirements.'" Tooker, 957 F.2d at 1214 (second alteration in original) (quoting United States v. Granda, 565 F.2d 922, 924 (5th Cir. 1978)). The government is not required to establish that Dien had knowledge of the specific regulations governing his conduct, but "must prove only that the defendant[] knew that [his] planned conduct was legally prohibited and that [he] therefore acted with an 'evil-meaning mind.'" Id. The government may use both direct and circumstantial proof, and the "jury may infer willful violation of a known legal obligation from 'facts and circumstances surrounding the case.'" Id. (quoting Liparota v. United States, 471 U.S 419, 434 (1985)).

For each container shipped, the government introduced the business records maintained by the freight forwarder, J.H. World Express, Inc. ("J.H. World"), that documented the shipping history of the container. J.H. World maintained a separate file

17

folder for each shipment that contained all paperwork relevant to that shipment. The file pertaining to C-1 contained a memorandum from J.H. World to Dien discussing "shipping out trucks from Louisiana to Ho Chi Minh"; letters from J.H. World to Hanjin Shipping ("Hanjin") arranging for a container to be picked up from Dien's Auto Service and delivered to Singapore; a Shipper's Export Declaration stating the goods had originated in Lafayette and ultimately were destined for Singapore; two bills of lading, one documenting the transfer of the goods from Lafayette to Singapore and the second indicating an immediate shipment from the port in Singapore to a vessel bound for Vietnam and delivery to Binh Chanh Import/Export Corporation ("Binh Chanh") in Ho Chi Minh; and an invoice dated December 25, 1993, indicating the goods were sold to Binh Chanh. The file pertaining to C-2 contained similar documents, including a memorandum from J.H. World to Hanjin regarding the shipment of the container from Lafayette to Singapore; a Shipper's Export Declaration stating that Singapore was the ultimate destination for the merchandise; two bills of lading identifying different destinations; and a commercial invoice dated January 8, 1994, indicating that the goods had been sold to Binh Chanh.

Dien argues that none of this evidence connects him to the shipment of the goods to Vietnam because, except for the fact that the goods were shipped from Dien's Auto Salvage, all of the documents were signed by Son Kim and list Golden Seas Im-Export

18

Trading Co. ("Golden Seas"), a company located in California, as the exporter. He contends that as there is nothing to connect him to Golden Seas, the evidence does not connect him to the shipments. However, during a search of the business offices at Dien's Auto Salvage, several documents were discovered connecting Dien to these shipments. For example, there were several documents, copies of which were found in the J.H. World folders, which were also found in the business office of Dien's Auto Salvage. Additionally, Simon Cheng, a former employee of J.H. World, testified that although in 1993 he was primarily getting directions from Son Kim, he also spoke to Dien over the phone and sent him faxes regarding the shipments. Furthermore, when Son Kim returned to Vietnam in 1994, Cheng relied on Dien and his employees for information on similar shipments to Vietnam. Furthermore, Victor Do, a former employee of Dien, testified that Dien shipped two containers to Vietnam in 1993, which contained some of the military vehicles Dien had bought at auction and that Dien told him that he was shipping the containers to Vietnam by way of Singapore to avoid the embargo. Finally, Do testified that Son Kim had told him that Son Kim and Dien were partners in the venture.

Given our standard of review, we believe this evidence is sufficient for a rational trier of fact to find the elements of the offense beyond a reasonable doubt. The documentary evidence establishes that both containers left Lafayette and were loaded

19

onto a vessel in California prior to the lifting of the embargo. Furthermore, that same evidence establishes that the goods were shipped to Singapore and immediately transferred to a vessel bound for Vietnam. When combined with the fact that the sales invoices executed prior to the lifting of the embargo indicated that the goods had been sold to Binh Chanh in Vietnam, a rational juror could find that Singapore was merely a conduit to disguise the intended export to Vietnam.

Furthermore, there is no question that Dien was aware of the restrictions. Dien admitted during cross-examination that he knew that there was an embargo in place against Vietnam, and Do testified that Dien told him he was shipping the goods to Vietnam by way of Singapore because of the embargo. The documents on file at J.H. World indicate that although the goods had been sold to Binh Chanh in Vietnam, the shipper's export declaration listed the ultimate destination of the goods as Singapore. Similarly each file contained one bill of lading indicating the goods were to travel from the United States to Singapore and a second bill of lading indicating the almost immediate transfer of the goods from Singapore to a ship bound for Vietnam. A reasonable jury could interpret this evidence as an attempt to conceal the ultimate destination of the goods. That kind of concealment has frequently been considered a relevant factor in establishing that the acts were committed with an "evil mind." See Tooker, 957 F.2d at 1214-18; see also United States v. Macko, 994 F.2d 1526,

1535 (11th Cir. 1993) ("If the defendants thought they could legally trade with Cuba by adding a third country to their shipping and travel routes, they had no reason to conceal . . . Cuba's status as the ultimate destination of the machinery and supplies."). Therefore, we find there is sufficient evidence for a reasonable juror to find that Dien had knowledge of the embargo and acted with the specific intent to violate it.[15]


### B. Conspiracy to Commit Theft of Government Property

Dien's conviction for conspiracy to commit theft of government property is based on the allegation that Dien purchased surplus military vehicles, intentionally failed to mutilate specific parts of the jeeps as required for title to pass to the purchaser, and then shipped those jeeps and jeep parts to his co-conspirator in Vietnam. Dien argues that the

---

[15] Dien argues that rather than showing he possessed the specific intent to violate the embargo, the evidence suggests he sent the goods to Singapore, intending to wait for the embargo to be lifted before sending the goods to Vietnam. Similarly, Dien contended that he was not responsible for exporting the containers to Vietnam, but was simply hired by Son Kim to disassemble the merchandise at Dien's Auto Salvage. While it is possible to interpret the evidence in this manner, it is not the only interpretation. "'The jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial, and the court must accept all reasonable inferences and credibility determinations made by the jury.'" Macko, 994 F.2d at 1532 (quoting United States v. Sellers, 871 F.2d 1019, 1021 (11th Cir. 1989)).

Furthermore, there is simply no evidence, documentary or otherwise, that Dien made any effort to prevent the merchandise from arriving in Vietnam until the embargo was lifted.

21

evidence is insufficient to support his conviction on this charge because the government failed to prove (1) that the types of jeeps he purchased were of the type that needed to be mutilated for title to pass, (2) that the parts were not mutilated, and (3) that there was an illegal agreement to not mutilate the required parts but to export them to Vietnam.

"To establish a violation of 18 U.S.C. § 371, which forbids criminal conspiracies, the government must prove beyond a reasonable doubt (1) that two or more people agreed to pursue an unlawful objective, (2) that the defendant voluntarily agreed to join the conspiracy, and (3) that one or more members of the conspiracy committed an overt act to further the objectives of the conspiracy." United States v. Lage, 183 F.3d 374, 382 (5th Cir. 1999). "[T]he agreement need not be an express or formal agreement; a tacit understanding is sufficient." United States v. Burns, 162 F.3d 840, 849 (5th Cir. 1998). Furthermore, the government must also "prove 'at least the same degree of criminal intent required for the substantive offense itself.'" Lage, 183 F.3d at 382 (quoting United States v. Osunegbu, 822 F.2d 472, 475 (5th Cir. 1987)). The substantive offense at issue is contained within 18 U.S.C. § 641, which prohibits theft of government property. To establish a violation, the government must show that the property belonged to the government and had a value in excess of $1000, that the defendant stole or converted the property for his own use or for the use of another, and that he

22

did so knowing the property was not his and with the intent to deprive the owner of the use or benefit of the property. See 18 U.S.C. § 641; United States v. Aguilar, 967 F.2d 111, 112 (5th Cir. 1992).

After a review of the record, we believe there is sufficient evidence to support Dien's conviction. Dien's conviction is based on his purchase of the residue of forty-three military jeeps. The Defense Reutilization and Marketing Service ("DRMO") sells excess military property to the general public by auction.[16] The evidence introduced by the government shows that, on June 3, 1994, Dien submitted a bid on Dien's Auto Salvage letterhead for Item # 72 contained in the "Invitation For Bids" # 31-4397 offering to pay $5425 per unit. On his signed bid, Dien stated that he agreed to be bound by all of the terms and conditions of the Invitation For Bids. According to the Invitation For Bids, Item # 72 offered for sale the residue of forty-three M151A2 jeeps, which were being sold for parts. The description clearly stated that the jeeps were being sold for

---

[16] According to testimony, the DRMO works with all branches of the military to deal with excess military property. It first attempts to reuse the excess property within the military, but if it is no longer needed by the military in any way, then the DRMO will sell the excess property to the general public. When it has excess military property to sell, the DRMO distributes a catalog of the property available for sale to the general public. This catalog is known as an "Invitation For Bids" and, in it, is a description of the property by item number and the terms and conditions of the sale. A purchaser who wishes to buy some of the items listed in the Invitation For Bids submits a bid and, if his bid is accepted, receives a "Notice of Award."

23

parts and that the purchaser needed to remove the front and rear suspension and attaching drive shafts, and that those parts, along with the body, "must be mutilated."

Additionally, the Invitation For Bids incorporated by reference a pamphlet entitled "Sale by Reference, August 1989," noting that Special Circumstance Conditions are specified in the item description. As an employee for the Department of Defense testified, the description for Item # 72 states that several articles apply, including Part 09-A. Part 09-A states in relevant part: "The property requiring . . . mutilation will not be removed from Government premises and title will not pass to the Purchaser until . . . mutilation has been completed by the purchaser and approved by the Contracting Officer or his authorized representative." Furthermore, a former employee of the DRMO testified that she personally spoke to Dien regarding his purchase of the 43 jeeps and that she remembered her supervisor had specifically reminded her to make it clear to Dien that certain parts needed to be destroyed.

Do testified, however, that when Dien sent him and another employee to Fort Polk in July 1994 to disassemble the jeeps, Dien specifically told him to remove the "engine and transmission, the suspension parts, plus any other parts that we can get off the Jeeps" and to put them in a container to be shipped to Vietnam. The only part he was told to destroy was the exterior body. Additionally, Do admitted that, other than the body, no other

24

parts were mutilated.  Finally, Do made a contemporaneous list, which was introduced as evidence, of the parts that were placed in the containers at Fort Bliss and shipped directly to Vietnam, and that list included parts that should have been destroyed, such as front axles, rear axles, and springs.[17]

Furthermore, several letters exchanged between Dien and Son Kim discuss the upcoming sale of the forty-three military jeeps and their potential sale to Phu Yen General Materials Company ("Phu Yen") in Vietnam.  Although the letters discuss the fact that the jeeps must be disassembled, there is no mention of the mutilation requirement.  In fact, Son Kim asked Dien to send him a picture of the jeeps, which would hardly be necessary if the jeeps were being sold for parts.

In light of the above evidence, a reasonable juror could have found that Dien purchased the M151A jeeps; that a condition was attached to the purchase of those jeeps, which required certain parts to be mutilated prior to the transfer of title; and that Dien, knowing and agreeing to the requirement, intentionally instructed his employee to violate it.  Furthermore, a reasonable juror could have found that there was an illegal agreement

---

[17]  Dien argues that the government certification that the parts were mutilated establishes that title passed to the purchaser.  However, Article 09-A clearly states that the mutilation must be completed and approved for title to pass.  Do testified that he did not mutilate the requisite parts and the parts were listed as being placed in the containers that were sent to Vietnam.

25

between Son Kim and Dien to purchase those jeeps as residue, to intentionally fail to mutilate required parts, and to send the unmutilated jeeps to Vietnam.  We find there is sufficient evidence to support Dien's conviction of conspiracy to commit theft of government property.


### C.  Violations of the Export Administration Act

Finally, Dien argues that the evidence is insufficient to support his conviction for conspiracy to export military equipment in violation of the Export Administration Act of 1979 ("EAA") and for the seven substantive counts of exporting military equipment in violation of the EAA.

The EAA authorizes the Secretary of Commerce to prohibit or curtail the export of any goods or technology subject to the jurisdiction of the United States to protect the national security, foreign policy, or short supply interests of the United States.  See 50 U.S.C. app. §§ 2404-2406.  Pursuant to that authority, the Secretary may require an exporter to obtain a validated export license.  See id. § 2403(a).  The Secretary is required to maintain a list (the "Commerce Control List") stating the licensing requirements for goods and technology.[18]  See id. § 2403(b).  The EAA provides for criminal penalties for one who

_____

[18]  The Commerce Control List identifies, for example, the type of license needed, the reason for control (e.g., national security or foreign policy), the items controlled in a particular category, and for which countries a license is needed.

26

"knowingly violates or conspires to or attempts to violate any provision of this Act . . . or any regulation, order, or license issued thereunder."  50 U.S.C. app. § 2410(a).[19]

In order to establish a violation of § 2410(a), "the government was required to prove beyond a reasonable doubt that [Dien] knowingly exported or attempted to export a controlled commodity, without obtaining the appropriate export license in violation of 15 C.F.R. § 799.1 Supp. 1 (the commodities control list)." United States v. Shetterly, 971 F.2d 67, 73 (7th Cir. 1992).

Dien was charged with seven substantive counts of violating § 2410(a), each count based on a separate shipment of goods from the United States to Vietnam.  The government first introduced evidence that Dien made several purchases of surplus military equipment, including 5.5 ton jeeps, by introducing both the catalogs of the merchandise and the Notices of Award found in the business office of Dien's Auto Salvage.  Dien admitted to having purchased forty to fifty military vehicles and was only able to

---

[19]  The Export Administration Act also provides more severe criminal penalties for one who "willfully violates or conspires to or attempts to violate any provision of this Act . . . or any regulation, order, or license issued thereunder, with knowledge that the exports involved will be used for the benefit of, or that the destination or intended destination of the goods or technology involved is, any controlled country or any country to which exports are controlled for foreign policy purposes."  50 U.S.C. app. § 2410(b).

identify one purchaser in the United States.[20]  Furthermore, Do testified that in 1993 and 1994, Dien regularly received shipments of military trucks that he had purchased and sent them to Vietnam.

A senior licensing officer from the Department of Commerce testified that the Commerce Control List included military utility vehicles and that for those vehicles, including the M151 vehicles and parts at issue, a license was required to ship those types of vehicles to Vietnam.  The case agent for the Department of Commerce testified that, having checked the government records, no license was ever issued authorizing the export of these goods.  Furthermore, Dien does not contend that he had a license to ship the merchandise to Vietnam.

Additionally, the government introduced several Invitation For Bids discovered during the search of Dien's Auto Salvage, several of which gave notice to the purchaser that restrictions applied to the export of the goods.  The catalogs covered the time period following the lifting of the embargo and stated, on the bid form, the following or similar language: "The bidder further acknowledges receipt of notification that special United States restrictions bar unauthorized exports and re-exports of United States origin commodities directly or indirectly to . . . Vietnam."

---

[20]  He alleged he sold the remaining vehicles as parts.

Furthermore, the documents introduced for each shipment from their J.H. World folders stated that the goods were traveling to Vietnam and had descriptions of the merchandise which varied. Each file contained a Shipper's Export Declaration that indicated the goods were traveling from Louisiana to Vietnam. Similarly, each file contained at least one document, such as a bill of lading from J.H. World or an invoice from J.H. World, indicating that the containers contained "5.5 ton trucks" or "army trucks," while at the same time containing other documents, such as a Shipper's Export Declaration or a shipper's bill of lading, which indicated the containers held "truck parts." Furthermore, Nick Vuong, who also worked for J.H. World, testified that, in 1993, a shipment Dien attempted to make to Vietnam got rejected because the documents sent with the containers indicated they contained military vehicles or military vehicle parts. After that point, Vuong testified that Dien instructed him to list the contents of the containers as "truck parts."

Dien alleges that he cannot be connected to the shipments because few of the documents in the files indicate his name or the name of Dien's Auto Salvage. In fact, the first five shipments indicate that they were shipped by "Golden Mountain Inc.," a company to which Dien alleges he has no connection.

However, a reasonable jury could find that Dien was actively involved in the shipment of the merchandise and the activities of Golden Mountain. Several documents in the J.H. World files

indicate that Dien and Dien's Auto Salvage were involved.  For example, several of the J.H. World files demonstrate that the J.H. World employees used the names Golden Mountain and Dien's Auto Salvage interchangeably and that Dien was connected with both companies.  One file has "Dien's Auto Salvage" written on the tab and contained a letter from Dien to Cheng, but identifies Golden Mountain as the exporter on the shipping documents.  By contrast, another file has "Golden Mountain" written on the tab, but identifies Dien's Auto Salvage as the exporter on the shipping documents.  Furthermore, Cheng testified that during 1994, whenever he had to speak to someone about the shipments to Vietnam, he called Dien or Dien's secretary.  Vuong, who was responsible for filing out the paperwork on the shipments, also testified that he contacted Dien to determine how to fill out the paperwork.  Finally, two of the shipments involved the same containers at issue in the conspiracy to commit theft of government property counts.  Those two containers were filled with trucks dismantled by Do, an employee of Dien, and those containers were shipped directly from Fort Polk to Vietnam.  Finally, a contract between Phu Yen, Golden Mountain, and Thien Tan Trading Company L.T.D. lists Dien as the representative of Golden Mountain and was signed by him in that capacity.[21]

_____

[21]  The contract actually lists Dien Khac Nguyen, not Dien Duc Nguyen, as the representative of Golden Mountain.  However, as the contract was signed by Dien and a similar contract was entered into the next day which indicated that a Dien Khac Nguyen

30

We find this evidence sufficient to support Dien's convictions on the seven substantive counts of violating the EAA. A reasonable juror could find that Dien knowingly exported military vehicles to Vietnam without a validated export license.

In addition to the seven substantive counts, Dien was charged with conspiracy to violate the EAA. The elements of the offense of a criminal conspiracy are set out <u>infra</u> in Part III.B. Dien argues the evidence is insufficient to support his conviction of conspiring to violating the EAA. In addition to the evidence stated above, the government introduced several letters exchanged between Dien and Son Kim from which a conspiracy could be inferred. In one letter, for example, Dien asked Son Kim to see if any companies or military units would be interested in buying the motorized vehicles up for auction. Another specifically quoted the prices Phu Yen would pay for truck parts. Finally, many of the letters refer to "our" business or "our" interests and give instructions or directions as to how situations should be handled. Additionally, several bills from Dewey & Sons, a trucking company that transported some of the merchandise bought at auction to Dien's Auto Salvage, list Son Kim's name on the bill, but indicate that the bill was should be charged to Dien's Auto Salvage. Finally, Do testified that

---

was the representative of Dien's Auto Salvage, the jury could reasonably infer that Dien Khac Nguyen referred to Dien Duc Nguyen.

Son Kim told him that Son Kim and Dien were partners in the business.

This evidence, in addition to the evidence set out in Parts II and III, is sufficient for a reasonable jury to find Dien guilty of conspiring to violate the EAA.

## IV. CONCLUSION

Based on the reasons stated above, the decision of the district court is AFFIRMED.